**Ralph M. BELL, as Administrator of the Estate of Victoria Lynn Bell, a Deceased Minor, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 89–35V.**

United States Claims Court.

Nov. 29, 1989.

---

7. *See* n. 4, *supra*, p. 748.

Philip H. Rush, Philadelphia, Pa., for petitioner.

## ORDER FOR ENTRY OF JUDGMENT

NETTESHEIM, Judge.

■ Under the National Childhood Vaccine Compensation Program, 42 U.S.C. §§ 300aa–1—300aa–33 (Supp. V. 1987), this matter comes before the court on the basis of the Report and Recommendation filed on November 2, 1989, by Special Master Elizabeth E. Wright.

Neither party has filed any objection to the Special Master's findings or conclusions of law, and the time to so file has expired.

The Special Master's Report and Recommendation, including her recommended findings and conclusions of law, is adopted by the court pursuant to 42 U.S.C. § 300aa–12(d)(2) and attached hereto as if fully reproduced in this order.

Based on the foregoing,

IT IS ORDERED, as follows:

The Clerk of the Court shall enter judgment for petitioner in the amount of $263,-611.25, representing $250,000.00 for the statutory award to petitioner and $13,-611.25 for attorney's fees and costs.*

No additional costs.

## REPORT AND RECOMMENDATION FOR JUDGMENT **

ELIZABETH E. WRIGHT, Special Master.

This is an action for compensation for the vaccine-related injury and death of Victoria Lynn Bell (hereafter "Victoria")

---

* Since no additional material was filed after the Special Master's Report and Recommendation for Judgment, *see Bell v. Secretary,* No. 89–35V, slip op. at 1 n. * (Cl.Ct.Sp.Mas. Nov. 2, 1989), public access to this filing is not barred.

** This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within four-

teen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

brought by her father, Ralph M. Bell, as administrator of her estate, under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. § 300aa–1 et seq. (Supp. V 1987) (hereafter the "Vaccine Act" or "the Act").[1] Petitioner alleges that his daughter suffered a shock collapse or hypotonic-hyporesponsive collapse (hereafter "shock collapse") caused by the administration of a diphtheria-pertussis-tetanus (hereafter "DPT") vaccine, resulting in her death. See Petitioner's Prehearing Memorandum at 2–3, Bell v. Secretary of Health and Human Services, No. 89–35V (Cl.Ct.) (filed Aug. 4, 1989) (hereafter "Prehearing Memo").

The petition in this matter was filed on April 6, 1989. An evidentiary hearing was held on the issue of entitlement to compensation on August 14, 1989, in Philadelphia, Pennsylvania. At the hearing, petitioner presented four witnesses: Dorothy L. Bell, Victoria's mother; Ralph M. Bell, Victoria's father; Dr. Marvin E. Aronson, the forensic pathologist who performed the autopsy on Victoria; and Dr. Joan C. Waller, a board certified physician in internal medicine and infectious diseases. Although served with all pleadings and orders, the respondent never filed a notice of appearance, answered any pleading, responded to any order or participated in the evidentiary hearing in this matter.

Pursuant to § 300aa–12(c), and United States Claims Court Vaccine Rule 18(a), and for the reasons stated below, the undersigned recommends that judgment be entered for petitioner in the amount of $263,611.25 consisting of $250,000.00 to compensate petitioner for the death of petitioner's daughter, Victoria Bell, and $13,-611.25 in attorneys' fees and costs.

## ISSUES PRESENTED

The issues to be decided are whether petitioner is entitled to compensation for the death of Victoria Bell under the provi-

sions of the Vaccine Act—more specifically —(1) whether petitioner has demonstrated by a preponderance of the evidence that Victoria suffered a shock collapse within three days of the administration of the DPT vaccine in question and died as a result thereof; (2) that there is not a preponderance of the evidence that Victoria's death was due to factors unrelated to the administration of the DPT vaccine in question; and (3) an appropriate award of attorneys' fees and costs.

## I.

## HEARING RECORD

*Background facts.*

Victoria Lynn Bell was born on April 4, 1961, at the Albert Einstein Medical Center in Philadelphia, Pennsylvania. See Hearing Transcript of August 14, 1989, Bell v. Secretary of Health and Human Services, No. 89–35V, at 7 (Cl.Ct.) (hereafter "Tr. at ——"); Hearing Exhibit D–21, Bell v. Secretary of Health and Human Services, No. 89–35V, at 72 (Cl.Ct.) (hereafter "Ex. ——"). Victoria was born six weeks prematurely and was delivered by caesarean section. Tr. at 7, 25; Ex. A–2. She weighed 4 lbs. 7 oz. at birth. Tr. at 8; Ex. D–21.

Although Victoria was kept in an incubator for approximately 24 hours after birth, she did not need any artificial ventilatory support. Tr. at 18, 20. However, due to her low birth weight Victoria was kept in the hospital approximately three weeks, until she gained an appropriate amount of weight. Tr. at 8. She was released from the hospital on about April 25, 1961. Tr. at 8.[2]

Despite her premature birth, Victoria reached her early developmental milestones normally. Approximately one month after she arrived home, her eating and sleeping habits fell into regular patterns. "She

---

1. Hereafter, all references to sections of the Vaccine Act will eliminate the reference to 42 U.S.C.

2. Despite diligent efforts of counsel, the Albert Einstein Medical Center, where Victoria was

born, was unable to locate the hospital birth records of Victoria. However, hospital records of Dorothy Bell's admission for Victoria's delivery were produced and are in evidence. Tr. at 8–9; Ex. D.

[would] go to sleep somewhere around 8:30, after her last feeding. And she would sleep through until the next morning at around 7:00." Tr. at 11–12. As Mrs. Bell recalled, Victoria crawled, and by five months she could walk across the back of the couch holding her parents' hands. Tr. at 11–12. Mr. Ralph Bell, Victoria's father, testified that Victoria "was a very happy baby. She was always smiling." Tr. at 23.

Victoria visited her pediatrician, Dr. Olitsky, at his offices in Philadelphia, Pennsylvania, on three occasions. Tr. at 20. The first was near the end of May 1961, when she developed a cold. Tr. at 11. Victoria subsequently had one well baby check up, and then, on October 6, 1961, Mrs. Bell took Victoria to Dr. Olitsky for her first DPT vaccination. Tr. at 13–14, 21; Ex. A–2. Other than the cold in May, the record reflects no other significant illnesses or injuries until the administration of the DPT vaccine.[3] Ex. A–9.

At the time of her DPT vaccination, her mother remembers that Victoria weighed around 15 or 16 pounds and had gained back the ground her premature birth cost her. Tr. at 21, 34. According to Mrs. Bell, upon administering the shot, the doctor warned her that Victoria

> would be kind of passive, lethargic. Her appetite might be as well. She might be fussy. She would require more sleep, but not to be alarmed because this was just an after effect of the injection. And it would pass in 24 hours or so.

Tr. at 14. That evening, Victoria ate her normal evening meal of strained meats and fruit. Mrs. Bell gave Victoria a bottle and put her to bed between 7:30 and 8:00 p.m. Ex. A–2. As usual, Victoria slept through the night without fuss. Tr. at 14.

When Mrs. Bell awoke the next morning, October 7, 1961, her daughter was still asleep. Mrs. Bell had to wake Victoria to change her diaper. She attempted to give the child a bottle but Victoria would not open her mouth to drink. Tr. at 14. Mrs.

Bell would "put the nipple at her mouth and it was like ... trying to force someone's mouth whose teeth are clenched ... The nipple would just slide off her lips." Tr. at 60. Victoria was just partially awake at the time. She would only attempt to open her eyes. Tr. at 14–15. Throughout the morning, Mrs. Bell tried to get her to eat or drink, but Victoria still would not take any nourishment. Tr. at 15–16.

Mrs. Bell attempted to call Dr. Olitsky around 10:30 or 11:00 a.m. Tr. at 15. The nurse informed her that Victoria's behavior was normal. Throughout the afternoon, Mrs. Bell continued to try to get her to eat or drink, but Victoria simply lay in her crib in apparent sleep. Victoria was not flushed and Mrs. Bell could detect no fever, labored breathing or perspiration. Tr. at 15–16. Her color had no appreciable change. Tr. at 15.

Mrs. Bell attended Victoria throughout the day and into the early evening. Sometime after 5:00 p.m., when her mother went in to check on her, Victoria was no longer breathing. Tr. at 16. Mr. Bell attempted to revive his daughter, giving her mouth-to-mouth resuscitation. Tr. at 17. Mr. and Mrs. Bell rushed Victoria to Episcopal Hospital where she was pronounced dead on arrival. Tr. at 17. The time of death was recorded as 7:08 p.m. on October 7, 1961. Ex. A–3.

*Autopsy report.*

On October 8, 1961, Dr. Marvin Aronson performed an autopsy on Victoria. Tr. at 30–32. Ex. A–1. Dr. Aronson noted in the autopsy report that Victoria's death was an "idiosyncratic reaction" due to "appropriate prophylactic treatment" and that the manner of death was "therapeutic misadventure." Ex. A–1.

The autopsy report also contains the following statement written on the date of Victoria's death:

> Decedent was born prematurely in [Albert Einstein Medical Center] by Caesa-

---

**3.** Despite attempts by both petitioner and counsel, the medical records of Dr. Olitsky, who is deceased, have not been located. Tr. at 24. However, Mr. Bell's statement to the medical examiner's office following Victoria's death corroborates the child's apparent good state of health until her DPT vaccination. Ex. A–2, A–9.

rean section. She was 6 weeks early. Since then she has been under care of Dr. Olitsky ... who saw her at 3:00 PM on 10/6/61 and gave her a DPT shot. She was given 7 ounces of whole milk, water and syrup at 8:00 PM last night. She slept all night and this morning her mother had great difficulty awakening her. All through the day today she would not eat but the parents attributed this to after-effects of the needle which they were told they might expect. When the mother could not arouse her at all tonight they brought baby to the hospital. Dr. Reskof states no signs of trauma.

Ex. A–2. The Pronouncement of Death, signed by Dr. Reskof on the date of Victoria's death, states that "Baby was lethargic this a.m. [and] difficult to rouse[.] [S]he also refused to take nourishment." Ex. A–3. Dr. Reskof noted that Victoria had been administered a DPT vaccination on October 6, 1961. Under the heading marked "Probable Cause of Death," Dr. Reskof wrote "unknown—Possibly Reaction to DPT shot." Ex. A–3.

When Mr. Bell identified his daughter's body for the medical examiner's office on October 8, 1961, he related the following history concerning Victoria's death:

The only sickness that my daughter had had was a cold. She had been treated by Dr. Olitsky for formula change, checkups, etc. On 10/6/61, she was given a shot for Diphtheria and Tetanus and Whooping Cough. The doctor said there would probably be a reaction. On 10/6/61 after the shot, my daughter was unable to sleep. The following morning my daughter seemed listless and slept most of the day. When she couldn't be aroused, we took her to Episcopal Hospital.

Ex. A–9.

The autopsy report indicates that at death, Victoria weighed 16 pounds. Tr. at

34; Ex. A–4. The external examination showed the body of a "well-developed, well-nourished" six month old child. Ex. A–5. Other than a slight cyanosis [4] of the nail bed and lips, all external indicators were normal. Ex. A–5.

Similarly, the internal exam revealed no "significant abnormalities." Ex. A–5–6. Victoria showed some dilation of blood vessels upon microscopic exam, but otherwise the findings were again normal. Ex. A–6. There was an absence of significant food in the stomach. Tr. at 38. A urine test reflected a PH level of 6.7, classified as "high." Ex. A–7–8. The autopsy recorded pathological diagnoses [5] as 1) congestion and edema of the lungs; and 2) congestion of the viscera.[6] Ex. A–4–5.

## II.

### THE STATUTORY REQUIREMENTS

Section 300aa–13(a)(1) of the Vaccine Act provides that compensation shall be awarded to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

Pursuant to the above-referenced § 11(c)(1), petitioner must demonstrate that Victoria:

(A) received a vaccine set forth in the vaccine Injury Table ...

\*  \*  \*  \*  \*  \*

---

**4.** Cyanosis is a bluish discoloration of the skin due to excessive concentration of reduced hemoglobin in the blood. *The Sloane Annotated Medical–Legal Dictionary* at 176 (1987).

**5.** Dr. Aronson, who performed the post mortem exam, testified at the hearing. As he explained, pathological "diagnoses" are non-specific clini-

cal observations of someone who goes through the process of dying. Tr. at 32.

**6.** Dr. Aronson explained that the "viscera" include the internal organs such as the liver, spleen, bowel and kidneys. Tr. at 32.

(B)(i)(I) received the vaccine in the United States or in its trust territories,

\* \* \* \* \* \*

(C)(i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in sub-paragraph (A) ... and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table,

\* \* \* \* \* \*

(D)(ii) died from the administration of the vaccine, and

(E) has not previously collected an award or settlement of a civil action for damages for such vaccine injury or death.

§ 300aa–11(c)(1). In addition, where as in this instance, a death resulted, the action must be brought by the legal representative of the decedent's estate. § 300aa–11(b)(1)(A).

The above-mentioned Vaccine Injury Table (hereafter "Table") lists certain injuries and conditions which, if found to occur within a prescribed time period, create a rebuttable presumption that the vaccine caused the injury or condition. § 300aa–14(a).

In this case, petitioner contends that Victoria suffered a shock collapse within 3 days of receiving a DPT vaccine and died as a result of such shock collapse. Pre-hearing Memo at 2–3; Ex. B–1; Tr. at 41. Shock collapse is an injury or condition listed in the Vaccine Table. If the shock collapse occurs within three days of the administration of the vaccine and thereafter "any acute complication or sequela (including death)" of the shock collapse occurs, then the petitioner has established a rebuttable presumption of causation. *See* §§ 300aa–14(a)(I)(B) and (E).

In order to find a preponderance of the evidence, the trier of fact must "believe that the existence of a fact is more probable than its nonexistence before [the special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *In re Winship*, 397 U.S. 358, 370, 371, 90 S.Ct. 1068, 1075, 1076, 25 L.Ed.2d 368 (1970) (Harland, J., concurring), *quoting* F. James, Civil Procedure 250–251 (1965). Mere conjecture or speculation will not establish a probability. *Snowbank Enter. v. United States*, 6 Cl.Ct. 476, 486 (1984).

Upon establishing by a preponderance of evidence that a Table injury occurred, the burden of proof then shifts to the respondent to show that the death is "due to factors unrelated to the administration of the vaccine described in the petition." § 300aa–13(a)(1)(B). Such factors do not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." § 300aa–13(a)(2)(A).

### III.

### FULFILLMENT OF THE STATUTORY REQUIREMENTS

For the reasons set forth herein, the undersigned finds that the evidence presented by petitioner demonstrates by a preponderance of the evidence that Victoria Bell suffered a shock collapse within three days of the administration of the DPT vaccine on October 6, 1961, and died as the result of such shock collapse. Additionally, as explained by petitioner's expert witnesses and discussed *infra*, the record does not show by a preponderance of the evidence that Victoria's death was due to factors unrelated to the administration of the vaccine.

*Received a vaccine set forth in the Vaccine Injury Table.*

Victoria Bell was administered a DPT vaccination on October 6, 1961. Since the DPT vaccine is listed on the Vaccine Injury Table, this fulfills the requirement of part (A) of § 300aa–11(c)(1). Tr. at 13, Ex. A–2–3.

*Received the vaccine in the United States.*

Victoria was administered a DPT vaccination in the United States, specifically at

the offices of Dr. Olitsky in Philadelphia, Pennsylvania, thus fulfilling the requirement of part (B) of § 300aa–11(c)(1). Tr. at 14; Ex. A–2.

*Has not previously collected an award or settlement.*

By affidavit dated October 27, 1989, petitioner has sworn that no prior civil actions or claims have been filed arising from the circumstances of this claim, thus meeting the requirements of part (E) of § 300aa–11(c)(1). *See* Affidavit of Ralph M. Bell, *Bell v. Secretary of Health and Human Services*, No. 89–35V (Cl.Ct.) (filed Oct. 31, 1989).

*Petition brought by legal representative.*

Mr. Ralph Bell has been duly appointed the legal representative of the estate of Victoria Bell, thus satisfying the requirements of § 300aa–11(b)(1)(A). Ex. E.

*Sustained a Table Injury.*

██ As stated above, the undersigned finds that petitioner has demonstrated by a preponderance of the evidence that Victoria suffered a shock collapse within three days of the administration of the DPT vaccine on October 6, 1961. The evidence on the record proves that Victoria Bell received a DPT vaccination on October 6, 1961. The testimony of petitioner's medical experts, Drs. Marvin Aronson and Joan Waller, and the consistency of the symptoms described with the statutory definitions of shock collapse form the basis for such conclusion.

There are no records from the pediatrician who administered the vaccine in this case. Dr. Olitsky, Victoria's doctor, is deceased and his records have not been unearthed despite the diligent efforts of petitioner and counsel. Tr. at 24. Accordingly, the court must find other evidence of the date of vaccine administration.

Mrs. Bell testified that the vaccine was administered on October 6, 1961. Tr. at 13. Uncorroborated, such testimony might be insufficient to establish the date of inoculation. *See* § 300aa–13(a)(1). However, her statements are well-supported by the medical history as chronicled in the autopsy reports. Since such information was recorded contemporaneously, the undersigned finds sufficient indicia of trustworthiness to credit the accuracy of the October 6, 1961, administration date.

*Aids to interpretation.*

The Vaccine Act sets forth certain "aids to interpretation" as a complement to the Vaccine Injury Table. As to the diagnosis of shock collapse, the Act offers the following interpretation:

A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete[) ], hemiplegia or hemiparesis, loss or color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

§ 300aa–14(b)(1).

In the instant case, Mrs. Bell testified that she had to wake Victoria up on the morning of October 7, 1961. Tr. at 14. She described her daughter's condition throughout the day as only "partially" awake—a clear indication of depression of consciousness. The fact that Victoria lay in her crib all day in "apparent sleep" and refused to take any nourishment also indicates unresponsiveness to environmental stimuli. Mrs. Bell testified that at no time during the day of October 7, 1961, was Victoria alert. Tr. at 17. On the day following Victoria's death, Mr. Bell described his daughter's condition on October 7, 1961 as "listless" and noted that she slept most of the day and could not be aroused. Ex. A–9. Finally, Mrs. Bell testified that Victoria seemed "limp" on the morning of October 7, 1961, and throughout the day, demonstrating an apparent change in muscle tone. Tr. at 59–60.

The pathologist's clinical findings support Mrs. Bell's testimony, adding even more credibility to her statements. Victoria's PH level was high, a sign that Victoria's fluid intake was decreased. Tr. at 46. Consistent with Mrs. Bell's statement that Victoria would not eat anything throughout

the day, no significant food was found in her stomach. Tr. at 38.

*Expert testimony.*

At the hearing, Dr. Marvin E. Aronson,[7] the pathologist who performed the autopsy on Victoria in 1961, reaffirmed his opinion of twenty-eight years earlier. Tr. at 30–39. He concluded, to a reasonable degree of medical certainty, that Victoria's death was caused by the administration of the DPT vaccine the previous day. Tr. at 39; Ex. B.

Dr. Aronson stated that Victoria suffered a shock collapse sometime between the October 6, 1961, administration of the vaccine and Victoria's death at 7:08 p.m. on October 7, 1961. Tr. at 41; Ex. B–1. According to Dr. Aronson, the temporal relationship and Victoria's worsening condition between the administration of the vaccine and death support his conclusion that the DPT vaccination caused her death. Tr. at 39. Moreover, Dr. Aronson noted that Victoria's

> depression of consciousness and the prolonged sleeping, with difficulty arousing, and, of course, the final cardiovascular or respiratory arrest would fit with the clinical story which is present here.

Tr. at 42–43.

Upon review of medical research with respect to DPT vaccine and the medical records in this case, Dr. Joan C. Waller[8] also concluded that the DPT vaccination was the most likely cause of Victoria's shock collapse and resultant death. Tr. at 51; Ex. C–1. Dr. Waller similarly found the temporal relationship between the administration of the DPT vaccine and her death "quite compelling." Tr. at 52. In addition, she based her opinion on the fact that until the administration of the vaccine, Victoria was a "perfectly healthy child"; the next morning, she was "lethargic and difficult to arouse." Tr. at 52. Moreover, nothing in the postmortem exam pointed to another cause of death. Tr. at 51–52.

By proving Victoria suffered a shock collapse and died approximately 28 hours after the administration of the DPT vaccine, petitioner enjoys the advantages of a presumption of causation.[9]

*Died from the administration of the vaccine.*

While death may not be the ordinary sequela of a shock collapse, Drs. Aronson and Waller have testified that the facts presented here lead them to conclude that Victoria died of the irreversible consequences of shock collapse. The Table permits compensation for "any acute complication or sequela (including death)" of shock collapse. § 300aa–14(a)(I)(E). When read in conjunction with the Table, this statutory requirement is satisfied by showing that a shock collapse occurred within 3 days of the administration of the DPT vaccine, and that an acute complication or death followed such injury. In this case, Victoria exhibited symptoms of shock collapse and died within 28 hours of the ad-

---

7. Dr. Aronson graduated from Temple University Medical School in 1951. He received residency training in pathology and forensic pathology. Dr. Aronson is certified by the American Board of Pathology in clinical pathology, pathologic anatomy, and forensic pathology. He has been employed as a medical examiner for the City of Philadelphia since 1958. At the time of Victoria's autopsy, he was the assistant medical examiner of the City of Philadelphia. In 1971, he became the medical examiner of the City of Philadelphia, a position he held for some 15 years. Additionally, he has held teaching positions in pathology and forensic pathology at the medical schools of the University of Pennsylvania and Temple University. He has received a merit award from the American Academy of Forensic Sciences, has served on the editorial boards of several professional forensic pathology journals and has published numerous articles in professional journals. Ex. B–3–4.

8. Dr. Waller is board certified in internal medicine and infectious diseases. Presently, she is the chief of infectious diseases and an associate physician in the division of internal medicine at the Delaware County Memorial Hospital in Drexel Hill, Pennsylvania. Ex. C–3.

9. In this instance, petitioner actually went further, presenting proof of actual causation as well. The autopsy report lists DPT as a "possible" cause. Ex. A–3. In fact, the medical examiner's report *concludes* that Victoria's death was "due to appropriate prophylactic treatment, with ..." Ex. A–1. The "with" is crossed off. As Dr. Aronson testified, he was going to specify "the type of [DPT] vaccine, the exact brand name as well, ..." but he had "some difficulty obtaining that and decided to omit it." Tr. at 30.

ministration of the DPT vaccine. The requirements of § 300aa–11(c)(1)(D)(ii) have thus been satisfied.

*Possible alternative causation.*

■ While respondent presented no evidence in this case, the special master has reviewed all the evidence in the record to determine whether Victoria Bell's death could have been due to factors unrelated to the administration of the DPT vaccine in question. The special master finds that the record in this case does not show by a preponderance of the evidence that Victoria died from factors unrelated to the administration of the DPT vaccine in question. In fact, there is no evidence in the record that some other agent or condition caused Victoria's death. Her premature birth appeared to play no role in her death. She was not released from the hospital until she had gained a sufficient amount of weight and, as described by Mrs. Bell, she reached all her developmental milestones normally. More importantly, the medical examiner characterized Victoria's body as that of a "well-developed, well-nourished" six month old baby. Ex. A–5. Given her chronological age, Dr. Aronson found her height and weight "absolutely" normal. Tr. at 34.

The external postmortem examination revealed no signs of maltreatment or any other likely cause of death. Tr. at 35, 52. There was no evidence of disease, no significant dehydration, no sign of infection. Tr. at 36, 38, 52. As explained by the examining pathologist, the congestion and edema of the lungs and congestion of the viscera are not medical statements of causation but rather clinical observations. Tr. at 32. Furthermore, such findings are not incompatible with death due to shock collapse as "[t]his sort of process occurs in almost everyone who dies...." Tr. at 32. Moreover, the autopsy suggested no alternative cause. Tr. at 48.

Finally, Dr. Aronson concluded it would be "unreasonable," in light of Victoria's history, to suppose her death was caused by Sudden Infant Death Syndrome ("SIDS") or some unknown cause.[10] Tr. at 43. While compensation cannot be awarded if there is a preponderance of evidence that the death is due to factors unrelated to the administration of the vaccine, the act itself precludes such unrelated factors from including idiopathic, unexplained, unknown, hypothetical, or undocumentable cause. § 300aa–13(a)(2)(A).[11] Such is not the case here, however, because there is abundant credible evidence that Victoria's death was a sequela to shock collapse which occurred within three days of the administration of a DPT vaccine.

## IV.

## ATTORNEYS' FEES AND COSTS

The Vaccine Act provides that a judgment on a petition awarding compensation under the Act shall include an amount to

---

**10.** SIDS is defined as "the sudden and unexpected death of an apparently healthy infant, typically occurring between the ages of three weeks and five months, and not explained by careful postmortem studies." *Dorland's Illustrated Medical Dictionary* 1644–45 (27th ed. 1988).

**11.** None of the medical records suggest SIDS as a cause of death. However, even if it were proposed as a possible alternative cause of death in this case, a diagnosis of SIDS amounts to the absence of any identifiable cause of death and is not in itself an alternative explanation of death. Indeed, when Congress passed the Vaccine Act, it recognized that, given the current state of medical knowledge, there would be a certain number of instances in which compensation would be granted for victims whose injuries or deaths arguably were not caused by the administration of the vaccine. *See, e.g.,* H.R.

Rep. No. 908, 99th Cong. 2d Sess. 18 reprinted in 1986 U.S.Code, Cong. & Admin.News 6287, 6344, 6359, which explains such reasoning:

The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination. The committee further recognizes that the deeming of vaccine-relatedness adopted here [in the Vaccine Injury Table] may provide compensation to some children whose illness is not, in fact, vaccine-related. The committee anticipates that the research ... now ongoing and mandated by this legislation will soon provide more definitive information about the incidence of vaccine injury.... Until such time, however, the committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors.

cover reasonable attorneys' fees and other costs. § 300aa–15(e). Petitioner may also recover attorneys' fees and costs incurred in a prior civil action. § 300aa–15(e)(2).

This court has determined that the appropriate method for computation of attorneys' fees awarded under the Act is the "lodestar" model approach. *See Gregson v. Secretary of the Dept. of Health and Human Services*, No. 88–1V, *slip op.* at 7 (Cl.Ct., April 24, 1989). The lodestar is the product of the reasonable hours expended times a reasonable hourly rate. The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

The fee applicant carries the burden of proof. To meet such burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As the Claims Court noted in *Martin v. United States:*

> A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.

*Martin v. United States*, 12 Cl.Ct. 223, 227 (1987), citing *Hensley v. Eckerhart*, 461 U.S. at 429, 433, 441, 103 S.Ct. 1933, 1939, 1943, 76 L.Ed.2d 40.

Counsel for petitioner has submitted a petition for attorneys' fees and costs which consists of the following time and expenses:

Legal Time Charges

| Name | Position | Rate | Hours | Total |
|---|---|---|---|---|
| Philip H. Rush | Partner | $250.00 | 52 | $13,000.00 |
| Expenses | | | | $ 3,211.25 |
| Total Fees and Expenses | | | | $16,211.25 |

*See* Petitioner's Petition for Attorneys' Fees and Costs, *Bell v. Secretary of Health and Human Services*, No. 89–35V (filed Sept. 6, 1989) (Cl.Ct.) (hereafter "Fee Petition").

*Reasonable hourly rate.*

■ In calculating a reasonable hourly rate, the court must consider "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).[12] The Supreme Court noted in *Blum* that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. In discussing the applicant's burden, the Court stated that:

> To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits— that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11.

In support of his claimed rate of $250 per hour, Mr. Rush states that he graduated

12. Proof of prevailing market rates may be demonstrated in a number of ways, including: (1) affidavits of other attorneys or experts; (2) citations to prior precedents showing reasonable rate adjudications for the fee applicant, for comparable attorneys, or for comparable cases; (3) references to fee award studies showing reasonable rates charged or awarded in the relevant community; (4) testimony of experts or of other attorneys in the relevant community; (5) discovery rates charged by the opposing party; and (6) reliance on the court's own expertise to recognize applicable prevailing rates. Newberg, ATTORNEY FEE AWARDS 198 (1986).

from the National Law Center of George Washington University in 1971. He is a member of the Superior Court of the District of Columbia, the Circuit Court of Appeals of the District of Columbia, the Supreme Court of the Commonwealth of Pennsylvania, the United States Court of Appeals for the Third Circuit, and the United States Supreme Court. His practice is limited to civil litigation, concentrating in personal injury, including products liability, medical malpractice and other complex civil litigation. Fee Petition at Ex. C. Supplementally, he submitted the affidavit of Stephen F. Ritner, a member of the Supreme Court and Claims Court of the United States as well as the Supreme Court of Pennsylvania. Mr. Ritner avers that a rate of $250 for Philip Rush is reasonable considering his years of practice, experience and reputation. *See* Affidavit of Stephen F. Ritner, *Bell v. Secretary of Health and Human Services*, No. 89–35V (Cl.Ct.) (filed Sept. 12, 1989).

In Philadelphia, Pennsylvania, rates for partners' time range from $140 per hour to $275 per hour. *The Lawyer's Almanac* at 119 (1989). Here, counsel's claimed rate is not based on fees customarily charged by Mr. Rush or his law firm for similar services.

In determining a reasonable hourly rate, what is central is the knowledge and expertise of a given attorney performing given work in a given case. In exploring that issue, the affidavit of Mr. Ritner is not enlightening, as it fails to discuss the *particular* knowledge or skill of Mr. Rush. As the applicant in this instance bears the burden of proof, "generalized and conclusory 'information and belief' affidavits from friendly attorneys" will not suffice. *Nat'l. Assoc. of Concerned Vets. v. Sec. of Defense*, 675 F.2d 1319, 1325 (D.C.Cir.1982). Moreover, counsel's own affidavit does not rise to the level of detail necessary to enable this court to determine whether $250.00 per hour is a reasonable hourly rate.

Moreover, to justify an hourly rate in the upper range of the local community rates, not only must counsel demonstrate that he is skilled in the subject area, he must also produce evidence that those skills were needed in providing the *services* in the case in question. *See Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. In other words, Mr. Rush must bring forth at least some credible evidence suggesting that the services rendered, due to the complexity of issues involved or other factors, warrant the skills of an attorney commanding an hourly rate of $250.00. In the context of the Vaccine Act, such a nexus would be difficult to prove.

The Act provides an alternative to traditional litigation for those claiming vaccine-related injury or death. *See* § 300aa–10(a). Through the Vaccine Injury Table, the Act drastically reduces the difficult burden of causation formerly faced by vaccine litigants. By design, the Act was

> intended to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury and without a demonstration that a manufacturer was negligent or that a vaccine was defective.

H.R.Rep. No. 908, 99th Cong. 2d Sess., pt. 1, at 12, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6353; *see also*, 300aa–11(c)(1)(C)(i) and 13(a)(1)(A). Particularly in a case such as this, where the petitioner has claimed an "on the table" injury," few issues would be complex enough to warrant a top hourly rate. Petitioner's counsel has pointed to no such complexities. In short, counsel has failed to carry his burden of demonstrating that a rate of $250.00 per hour is consonant with the fees charged relevant community for services of similar complexity and difficulty.

As counsel has not satisfied his burden, a reasonable fee must be established upon a plenary review of the facts. The undersigned notes that Mr. Rush has been well prepared throughout the proceedings, his participation in all aspects of the case has been professional and competent, and his conduct of the hearing was effective in creating a clear and complete record. For the foregoing reasons, and considering the current range of market rates in the Phila-

delphia area, the undersigned concludes that an hourly rate of $200.00 is fair, reasonable, and provides adequate compensation for the particular services provided by Mr. Rush to his client in this case.

*Reasonable hours expended.*

■ In reporting time expended, the applicant need not account for every minute. However, "at least counsel should identify the general subject matter of his time expenditures." *Hensley,* 461 U.S. at 437, n. 12, 103 S.Ct. at 1941, n. 12. Once counsel appropriately identifies his time, those hours which reflect "excessive, redundant, otherwise unnecessary" hours must be excluded by the court. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939. In requesting statutory fees, an attorney must use the same "billing judgment" as an attorney would in billing a client. "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to

statutory authority." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940.

In the instant case, Mr. Rush's 52 hours are all well documented and accounted for with contemporaneous time records. Each task is delineated with a reasonable and appropriate time expenditure attached. Accordingly, the undersigned finds the 52 hours claimed to be reasonable and compensable.

*Costs.*

Similarly, in calculating costs, all of Mr. Rush's expenses appear fair and reasonable. Relevant bills and receipts are attached. Fee Petition at Ex. B. The costs reflect only expenses such as court costs, postal fees, and expert retainers which are a direct incidence of this litigation.

Accordingly, the special master recommends a finding that reasonable attorneys' fees and costs should be awarded as follows:

Philip H. Rush  52 hours at $200/hr. = $10,400.00
Expenses                                 $ 3,211.25
      Total Fees and Costs               $13,611.25

## V.

## AMOUNT OF THE AWARD

(1) *Award in the case of death.*

An amount of $250,000 is mandated by the Vaccine Act which states that an award shall include "[i]n the event of a vaccine-related death, an award of $250,000 for the estate of the deceased." § 300aa–15(a)(2).

(2) *Attorneys' fees and costs.*

The second element, authorized by § 300aa–15(e), is an award for attorneys' fees and costs. It is recommended that an amount of $13,611.25 be awarded for reasonable attorneys' fees and costs.

## VI.

## ULTIMATE FINDINGS OF FACT

(1) Victoria Bell was administered DPT vaccine on October 6, 1961.

(2) The vaccine was administered in the United States.

(3) Victoria Bell suffered a shock collapse within three days of the administration of the DPT vaccine.

(4) Victoria Bell died from the administration of the vaccine.

(5) Neither the estate of Victoria Bell nor her parents have previously collected an award or settlement of a civil action for damages for the vaccine-related death of Victoria Bell.

## VII.

## CONCLUSIONS OF LAW

(1) The petition was timely filed.

(2) A preponderance of the evidence supports the conclusion that Victoria Bell died as a result of the administration of a DPT vaccine on October 6, 1961, and petitioner is thus entitled to compensation under the Act.

(3) There is not a preponderance of the evidence that Victoria Bell's injury and death were due to factors unrelated to the

administration of the DPT vaccine in question.

(4) Petitioner is entitled to $250,000 for the vaccine-related death of his daughter, Victoria Bell.

(5) Reasonable attorneys' fees and costs should be awarded in the amount of $13,-611.25.

(6) Judgment should be entered for the petitioner in the amount of $263,611.25.

IT IS SO RECOMMENDED.