David Dale HELLEBRAND and Jean Marie Hellebrand, individually, and on behalf of the Estate of Lacey Marie Hellebrand, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–372V.

United States Claims Court.

Dec. 19, 1991.

---

Thomas William Arbon, Dallas, Tex., Atty. of record, for petitioners.

Nancy R. Gaines, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## ORDER

HARKINS, Senior Judge:

Petitioners seek review in the United States Claims Court of the special master's July 23, 1991, decision, which found petitioners were ineligible for compensation under the National Vaccine Injury Compensation Program (the Program) for the vaccine-related death of their daughter, Lacey Marie Hellebrand.[1] Under the review stan-

---

1. The Program, established in 1986, includes procedures applicable to the functions of special masters and review of decisions of special masters. These procedures, through a series of amendments, have been changed substantially.

Provisions applicable to the Program, as amended, are contained in 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West 1991). For convenience, further reference to the Program will be

dards, the court is authorized to set aside any of the special master's findings of fact or conclusions of law found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[2]

Lacey Marie Hellebrand was born on December 31, 1983, by a routine Ceasarean section that followed an uneventful pregnancy. Beginning in her second month, she was given phenobarbital (trade name Levsin PB) for colic. During the second month, she had a cold and took medication for congestion and wheezing. Those problems had stopped about a week before the vaccination. On March 7, 1984, between 3:30 and 4 p.m., Lacey received her first diphtheria-tetanus-pertussis (DTP) vaccination. At about 6 p.m., during her feeding Lacey began to cry and did not finish the bottle. She cried hard for about 2 hours and constantly kicked. She was given her usual dosage of Levsin PB at about 7:00–7:30 p.m., and eventually calmed down and fell asleep. She woke at 9:30 p.m. and took some, but not all, of her bottle and cereal. She was put to bed about 10 p.m. About midnight she was awake in her crib and not crying, but appeared drowsy or dazed. Sometime between 6:00–6:30 a.m., on March 8, 1984, Lacey Marie Hellebrand was found dead in her crib.

The cause of Lacey's death is unknown. The medical examiner's report listed the cause of death as bronchopneumonia, because of microscopic findings in his examination. Otherwise the examination indicated death from an unknown cause, or Sudden Infant Death Syndrome (SIDS).

Two of respondent's medical experts, although they did not know the cause of death, identified SIDS, as applicable.[3] There are differences in medical opinion as to whether there is a causal connection between SIDS and the DTP vaccine. These differences are matters for the scientific community, and are not of concern in the disposition of this case.[4]

Petitioners' medical expert was of the opinion that toxic components of the DTP vaccine activated a cascade of events that led to the death. The special master noted that petitioners' medical expert did not know exactly what the DTP vaccine did in this case. Respondent's medical experts were of the opinion that Lacey's death was not causally connected to the DTP vaccination.

Petitioners point to evidence of depressed consciousness and non-responsiveness to stimuli, symptoms that are included in the aids to interpretation for a shock collapse or a hypotonic-hyporesponsive (H–H) collapse.[5] The record in this case supports a conclusion that the symptoms manifested by Lacey during the 15–hour period between the vaccination and death were compatible with descriptions of the effects of phenobarbital and with her normal symptoms of colic.

The special master concluded that a preponderance of the evidence did not demonstrate that Lacey Hellebrand suffered an on-Table injury after her DTP vaccination and prior to her death. The special master

to the relevant subsection of "42 U.S.C.A. § 300aa–__."

**2.** After the 1989 Amendments, the Claims Court function in review of a special master's decision, as defined in Section 300aa–12(e)(2), is as follows:

(2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—

(A) uphold the findings of fact and conclusion of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

**3.** SIDS is an acronym for an idiopathic syndrome. It applies to a situation where there is no medical explanation or documentable cause for the death.

**4.** See *Manley v. Secretary of HHS,* 18 Cl.Ct. 799, 809 n. 7 (1989).

**5.** Section 300aa–14(b)(1). An H–H collapse often is designated as a hypotonic-hyporesponsive episode (HHE).

concluded that the record did not show symptoms of an anaphylactic shock, and that the dramatic signs characteristic of an HHE were not present. The special master discounted the opinion of petitioners' medical expert as support for causation in fact. He rejected the conclusion that a temporal relationship to an unexplained death alone yields causation in fact. He concluded that the evidence was insufficient to establish that the DTP vaccination was in fact the cause of the death.

The special master, however, did not absolve the DTP vaccination as the cause for the death. The special master did not make a finding of fact as to the actual cause of death. Nor did the special master find as a fact that DTP was not the actual cause of death. Compensation under the Program was denied because statutory requirements, as interpreted by the special master, were not satisfied. The core of the special master's statutory analysis is the concept that, for an on-table H–H collapse, the statute requires a showing that the death occurred as an acute complication or sequela of the H–H collapse.

The special master's decision is abbreviated and obscure. The evolution and structure of the special master's statutory analysis, however, is traced in Part III of respondent's response to the motion for review.[6] The statutory analysis is the product of developing precedent in cases that examined the circumstances eligible for Program compensation as a Table injury after a SIDS autopsy.[7]

The Program is a unique effort to deal with a nationwide medical problem. It is designed to apply in a multitude of factual contexts that may be experienced by persons receiving vaccines in the United States or abroad. Compensation awards in the Program are particularly fact intensive. Application of precedent must be related to factual situations that truly are comparable. In this case the claim involves a death classified as SIDS that occurred 15 hours after a DTP vaccination. Other than the death, the factual context did not indicate an H–H collapse.

▇ Compensation is awarded under the Program when the record as a whole shows that the petitioner has demonstrated by a preponderance of the evidence a death from the administration of a vaccine set forth on the Vaccine Injury Table, *and* the death occurred within the applicable time period,[8] *and* there is not a preponderance of the evidence that the injury or death described in the petition is due to factors unrelated to the administration of the vaccine.[9] Inasmuch as a SIDS death is a situation that is included in the term "factors unrelated to the administration of

6. *See Allen v. Secretary of HHS*, No. 90–409V, slip op. at 1, 1991 WL 20054 (Cl.Ct.Spec.Mstr. Jan. 31, 1991), *remanded,* slip op. at 1, 1991 WL 179082 (Cl.Ct. May 31, 1991), *on remand,* slip op. at 1 (Cl.Ct.Spec.Mstr. Aug. 20, 1991), *aff'd,* 24 Cl.Ct. 295 (1991), *appeal docketed* No. 92–5028 (Fed.Cir. Nov. 29, 1991); *Powels v. Secretary of HHS*, No. 90–852V, slip op. at 1 (Cl.Ct. Spec.Mstr. Apr. 17, 1991).

7. *See also Manley v. Secretary of HHS*, 18 Cl.Ct. 799; *Zinko v. Secretary of HHS*, No. 90–774V, slip op. at 1, 1991 WL 105485 (Cl.Ct.Spec.Mstr. May 30, 1991).

8. The statute in Section 300aa–11(c)(1)(C)(i) requires, for an on-Table claim, that the petition by affidavit and supporting documentation demonstrate that the injured or dead person

    sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in associa-

tion with the vaccine referred to in subparagraph (A) or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or . . .

9. Sections 300aa–13(a)(1)(A) & (B) provide:
  (1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—
  (A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and
  (B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

the vaccine," compensation for a SIDS death is authorized.[10]

With respect to shock collapse or H–H collapse, the Vaccine Injury Table provides a 3–day time period after the DTP vaccine is administered for first symptom or manifestation of onset or of significant aggravation.[11] The Table recognizes that death may be an acute complication or sequela of a shock collapse or H–H collapse, which arose within the 3–day period. A time period for such acute complication or sequela is "not applicable." [12]

To assist in identification of the injuries listed on the Table that entitle a petitioner to the presumption of causation, the statute provides qualifications and aids to interpretation, which "shall apply to" the Table. One of the indicia that may evidence a shock collapse or a H–H collapse is cardiovascular or respiratory arrest.[13]

The special master's conclusion that a preponderance of the evidence in the record did not demonstrate an on-Table injury results from an analytical procedure that eliminates one of the indicia or symptoms listed in the aids to interpretation. In this analysis, death neither establishes nor precludes an H–H collapse, but death must be shown to be a sequela of a collapse that is evidenced by other symptoms in the aids to interpretation. A statement in the *Allen* case explains reasons for eliminating the cardiac and respiratory arrest item:

As to the cardiac and respiratory arrest, I give no weight to them. I agree with Respondent that it would be a tautology to base compensability for deaths on items which occur in essentially all deaths. Congress allowed compensation in death cases when death followed certain specific symptoms. To hold that factors (cardiac or respiratory arrest) indicative of one of those statutory symptoms (hypotonic-hyporesponsive collapse) is present in its statutory meaning whenever death occurs would render meaningless the rest of the statutory structure. Every death case within seventy-two hours of vaccination would then be compensable (absent some alternative cause). If Congress had intended such a result, it would have skipped the intermediate requirement of finding an on-table injury of which death was a sequela.[14]

The analytical procedure for determining the presence of an H–H collapse, after elimination of the cardiac and respiratory arrest item, involves a weighing of the remaining indicia or symptoms. This procedure was explained in *Allen* as follows:

No one would argue that Congress intended to compensate only the most dramatic cases of hypotonic-hyporesponsive collapse. Few would argue, at the other extreme, that any case in which a child was harder to wake up or less energetic than usual, was compensable. In a case where it is clear that several of the signs of a statutory collapse have taken place, where on the spectrum does the indicator change from *de minimis* to *de jure?* For my part, I think experience suggests one answer. The issue comes down to a sliding scale in which the two variables, number of signs and degree of severity of the sign, interact. For instance, where one sign in the Aids to Interpretation is established and is shown to have been very dramatic (as in the *Bell* case

---

**10.** Section 300aa–13(a)(2)(A) provides:

For purposes of paragraph (1), the term "factors unrelated to the administration of the vaccine"—

(A) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition, and ...

**11.** Section 300aa–14(a)I C.

**12.** Section 300aa–14(a)I E.

**13.** Section 300aa–14(b)(1) provides:

(b) **Qualifications and aids to interpretation**

The following qualifications and aids to interpretation shall apply to the Vaccine Injury Table in subsection (a) of this section:

(1) A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete,) hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

**14.** *Allen v. Secretary of HHS,* slip op. at 3–4, 1991 WL 20054 (Cl.Ct.Spec.Mstr. Jan. 31, 1991).

[*Bell v. Secretary,* 18 Cl.Ct. 751 (1989)]) the statutory symptom may properly be found to have existed. Where the degree of the sign is significant but not dramatic, then, in most cases, I will need evidence of multiple significant signs.

\* \* \* \* \* \*

A sign is "slight" when a reasonable parent might pay no attention to it at the time (whether or not the parents did pay attention to it) but recall it only in retrospect. A sign is "significant" when a reasonable parent might make a cautious reaction such as staying up much of the night, pointing out the sign to others and asking their opinions, calling a doctor's office during the daytime, giving over-the-counter medication, staying home from work or giving special instructions to a baby-sitter, *or* where credible (and preferably corroborated) testimony shows by specific and objective descriptions that the sign existed to such a degree that a reasonable parent would have been justified in taking any of those courses of action, whether or not they did take such action. A sign is "dramatic" when it exists to such a degree that the failure to seek immediate medical advice (including seeking emergency room treatment) would be unreasonable, whether or not such advice was actually sought.[15]

■ The Vaccine Injury Table determines by law that the temporal association of the listed injuries with the vaccination will constitute sufficient proof that the vaccine caused the harm. The Table replaces tort standards of a causation in fact with a causation in law based on temporal association. Temporal association alone establishes legal causation for a Table injury. In the Program, compensation may be paid to eligible petitioners for an on-Table injury without proof of a causal connection between the vaccine and the death. A causal

relationship between DTP and SIDS is not relevant to disposition of this case.

As support for its contention that compensation requires petitioners to show (1) a Table injury within the requisite time period, and (2) that the death occurred as an acute complication or sequela of the Table injury, respondent cites *Munn.*[16] *Munn* did not deal with a SIDS death. Significant differences in the facts in *Munn* determined that there was a need to show the presence of an acute complication or a sequela.

In *Munn* the cause of death was known. The SIDS issue was not involved. The cause of death was severe necrotizing pneumonia; the child died from infection, not from shock. The death occurred after the 3-day Table period had expired. She suffered an HHE within the 3-day period. Clearly the facts in *Munn* are not at all comparable to the facts in this case, where a death identified as SIDS-related occurred within 15 hours of the vaccination.

In order for the death in *Munn* to have been compensable, the post-Table period death had to have been shown to be an acute complication or sequela of the HHE. Alternatively, there had to have been a showing that the vaccine sustained or significantly aggravated the pneumonia. In *Munn,* the death was a sequela temporally. The cause of death, however, was pneumonia, and the HHE was not a sequela causally. Since the statute requires the sequela to be of the Table injury, the death was not compensable.[17]

■ The special master's elimination of the cardiac and respiratory arrest items from the indicia and symptoms listed in the aids to interpretation does not accord with time honored canons of statutory construction. The starting point for interpreting a statute is the language itself. If the language is clear according to the ordinary

15. *Id.* at 7 & 8–9.

16. *Munn v. Secretary of HHS,* 21 Cl.Ct. 345, 351 (1990), *appeal docketed sub nom., Vukelich v. Secretary of HHS,* No. 91–5020 (Fed.Cir. Oct. 29, 1990).

17. As of the date of this order, no decision has been issued on the appeal in *Munn.* The factual differences between this case and *Munn,* however, are such that final disposition of the claims in *Munn* will have little application to this case.

meaning of the words, it normally is conclusive. All provisions are to be considered, and the statute as a whole is to be construed so as to give meaning to all of its parts.[18]

The items in Section 300aa–14(b)(1) are listed in the alternative such that any one of these indicia may be used, when in accord with the facts, to evidence a shock collapse or a H–H collapse. Each of the items has utility for the purpose of determination of a Table injury. The cardiovascular or respiratory arrest item, for example, does not deprive the other items of utility when death occurs after the Table 72 hour period. Nor does the cardiovascular or respiratory arrest item make a death compensable in those cases where there is a known alternative cause for the death. The cardiovascular or respiratory arrest item only supersedes the other indicia when the cause of death is unknown, *i.e.,* an idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, illness or condition. SIDS is such a condition.

It is clear that the statute does not intend that SIDS autopsy should be a bar to recovery. The Vaccine Table provides for compensation of a SIDS death that is a sequela to an H–H collapse. Eligibility for compensation for a death that occurs within 72 hours of the DTP vaccination because of an H–H collapse is within the express terms of the statute. It is not for the court to delete this indicia on the ground that it may lead to a medically absurd result, or, may authorize compensation for all SIDS deaths that occur within 72 hours after vaccination with DTP.

The responsibilities and functions of special masters in the Program's amended procedures are unique. The 1989 Amendments established a separate office of special masters within the Claims Court, administered by a chief special master, and gave that office special authority and considerable administrative independence in decisions on claims for compensation under the Program.[19] The 1989 Amendments directed promulgation of separate rules for special masters, and established specific criteria the rules were to contain.[20] Standards were established for conduct of proceedings on a petition.[21] Review of a special master's decision by the Claims Court is expected to be an exceptional occurrence rather than a routine procedure.

■■■ In the amended Program, the scope of review in the Claims Court of a special master's decision for these reasons is limited. A special master's decision may not be disturbed unless the court finds it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[22]

In the amended Program, the Claims Court may not parse the record de novo and substitute what would have been its judgment had it initially decided the matter. The Claims Court may not substitute its own judgment for that of the special master.[23] Where there is conflicting evidence, appropriate deference is given the special master's findings of fact.[24] Findings of fact made by the special master are reviewed under a standard that is narrower than the "clearly erroneous" standard provided in RUSCC 52(a). Legal concepts developed in the Court of Claims in Wunderlich Act contract cases for application of

18. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *United States v. Clark,* 454 U.S. 555, 560, 102 S.Ct. 805, 809, 70 L.Ed.2d 768 (1982); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 25–26, 97 S.Ct. 926, 941–42, 51 L.Ed.2d 124 (1977). *Wiggins v. Secretary of HHS,* 898 F.2d 1572, 1574 (Fed.Cir.1990); *Massing v. Secretary of HHS,* 926 F.2d 1133, 1135 (Fed.Cir.1991).

19. Section 300aa–12(c).

20. Section 300aa–12(d)(2).

21. Section 300aa–12(d)(3)(B).

22. *See Hale v. Secretary of HHS,* 22 Cl.Ct. 403, 406 (1991).

23. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

24. *Hambsch v. Dept. of Treasury,* 796 F.2d 430, 436 (Fed.Cir.1986).

the "substantial evidence" standard to issues of fact, do not apply in a review of a special master's decision. If the evidence in the record has been considered, and such evidence provides a reasonable basis for the special master's finding, the special master's findings of fact may not be set aside. Mixed questions of law and fact, which entail the application of a legal standard to a given factual pattern, are to be reviewed under this new and narrower standard.

This limited scope of review is tailored to the concepts and objectives of the Program. The standard "arbitrary, capricious, an abuse of discretion or otherwise in accordance with law" is based on one of the criteria established by the Administrative Procedure Act (APA).[25] To the extent consistent with Program objectives to be attained through the Office of Special Masters, decisions interpreting the APA standard have application in a review of a special master's decision. Under the APA standard, conclusions of law are considered de novo.[26] On issues of law under the Program, however, recognition is to be given to the special master's expertise in the development of these novel procedures. A decision on issues of law applicable to the Program should be overturned only when error is unmistakably clear.[27]

In this case, all of the special master's findings of fact have been recognized and accepted. The special master's elimination of the cardiovascular or respiratory arrest item from the determination of an on-Table injury presents an issue of statutory construction which is an issue of law. The special master is in error on this issue of law. In terms of the Program objectives and in legal principles applicable to statutory construction, the error is unmistakably clear. The special master's decision, therefore, as to an on-Table injury must be rejected.

█ The SIDS death within the 72 hour statutory period of Lacey Marie Hellebrand was an on-Table injury eligible for compensation under the Program.

For the foregoing reasons, the special master's conclusion of law that Lacey Marie Hellebrand did not suffer an on-Table injury is not in accordance with law and is set aside. The Clerk is directed to enter judgment for an award under the Program to the petitioners in the amount of $250,-000. Costs and attorney fees under Section 300aa–15(b)(3) and Section 300aa–15(e) shall be determined by the special master in subsequent proceedings.

---

**25.** 5 U.S.C. § 706 (1988).

**26.** *Rice v. Wilcox,* 630 F.2d 586, 589 (8th Cir. 1980).

**27.** *See Hines v. Secretary of HHS,* 940 F.2d 1518, 1524 (Fed.Cir.1991).