Dawn R. WIDDOSS, n/b/m Dawn R. Hineline, Individually and as Administratrix of the Estate of Crystal Renee Miller, Deceased, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–486V.

United States Claims Court.

Feb. 6, 1992.

Ronald J. Karasek, Bangor, Me., for petitioner.

Laura S. Radack, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION

REGINALD W. GIBSON, Judge:

*Introduction*

This vaccine case is before the court on petitioner's motion for review of the special master's decision. It involves the death of Crystal Renee Miller (Crystal) approximately 20 hours after she received a diphtheria-pertussis-tetanus (DPT) vaccination. In her decision, the special master determined that the record failed to establish by a preponderance of the evidence that Crystal suffered a Table injury known as a hypotonic-hyporesponsive collapse (HHE) (otherwise known as a shock collapse), as required by the National Childhood Vaccine Injury Act of 1986, *as amended*, 42 U.S.C. § 300aa–1 *et seq.* For the reasons expressed below, we reverse the special master's holding and direct the Clerk to enter judgment for the petitioner.

*Facts*

Crystal Renee Miller was born one month prematurely on January 30, 1988, to then 17–year old Dawn R. Widdoss.[1] Her mother testified, however, that "I think she was on time." Evidence indicates that Crystal was a healthy baby. She weighed 6 lbs. 1 oz. at birth, had normal APGAR scores [2] and was discharged February 2, 1988.

Two days subsequent to her discharge, Crystal was examined by her doctor. Medical records indicate that an episode of jaundice was observed at this time and that formula was recommended as an addition to her diet to abate the sickness. On Feb-

---

1. Dawn R. Widdoss is now Dawn R. Hineline (Mrs. Hineline). Crystal's natural father is David L. Miller, Jr.

2. APGAR scores "measure heart rate, respiration, muscle tone, responsiveness to stimulation and skin color." *Widdoss v. Department of Health and Human Servs.*, No. 90–486V, slip op. at 3, n. 6, 1991 WL 112208 (Cl.Ct.Spec.Mstr. June 7, 1990), *citing The Merck Manual of Diagnosis and Therapy* 986 (13th ed. 1977).

ruary 8, 1988, four days later, Crystal was again examined, and although it was noted that Crystal was "spitting up breast milk and formula," "vomited everything last night," and "refused breast" milk, the jaundice was subsiding and her formula was altered to account for this improvement. During the following few months of Crystal's infancy, she was examined several times and was treated for spitting up, inflammation of her ear, congestion, diarrhea, red eye and respiratory infections.

Nearly five months after her birth, on June 28, 1988, Crystal was administered her first DPT vaccination at a pediatric clinic in Stroudsburg, Pennsylvania. The actual shot was administered at approximately 1:00 p.m.[3] Prior to the vaccination, however, Mrs. Hineline notified the clinic that Crystal had recently been "wheezing" and "coughing" but, after hearing her cough, a nurse at the clinic stated that "she sounds just fine." Mrs. Hineline also advised the clinic that Crystal was taking Tylenol and was also on some type of antibiotic. Although Crystal had been off of the antibiotic for only three weeks and not the recommended four weeks, the clinic advised Mrs. Hineline that three weeks would "be fine."

Following the vaccine shot, Crystal was returned home and slept from approximately 1:30 p.m. to 2:30 p.m. After waking up, Crystal was fed by her mother between 2:30 p.m. and 3:00 p.m. Crystal's intake at this time normally consisted of an *entire* jar of baby food and five to six ounces of formula. However, on this particular occasion, Crystal accepted only one-half jar of baby food and one ounce of formula.

Following her feeding, Crystal was administered a "little bit of Tylenol" and laid down, where she slept until 5:00 p.m. Mrs. Hineline stated that it was not usual for Crystal to sleep that much and that she would sleep that much only when "she didn't feel good."[4] Furthermore, Mrs. Hineline noted that prior to her nap, Crystal was acting fussy, whining continuously, and was not playful. While Crystal was sleeping, Mrs. Hineline would continuously check in on her, stating that "I woke her up a lot to make sure she was all right because I had read things about these shots and I was very nervous," and that the clinic "told me she could get sick."[5]

At 5:00 p.m. Crystal awoke on her own. Mrs. Hineline tried to play with her but she did not appear interested or energetic. Mrs. Hineline stated that normally Crystal "would just scream to play" but that at this time she did not want to do anything and appeared disoriented. However, there was no indication of any change in Crystal's color, except for the area around where Crystal had received her shot, which was red and swollen.

Between the hours of 5:00 p.m. and 9:00 p.m., Crystal consumed an entire jar of baby food and one ounce of formula although her normal intake at this time was four to five ounces. During this entire four-hour period, however, Crystal appeared very tired. Therefore, between 9:00 p.m. and 9:30 p.m. Crystal was put to bed where she immediately went to sleep. Following thereon, between the hours of 11:00 p.m. and 11:30 p.m., Mrs. Hineline checked Crystal, "woke her up to make sure she was all right," and also fed her only one ounce of formula. At this time, Crystal was unusually groggy and continued to appear to be disoriented. Thereafter, she slept continuously through her usual 2:00 a.m. and 4:00 a.m. feedings during the morning of June 29, 1988, and at 5:00 a.m., Mrs. Hineline was awakened by Crystal's crying.

During this time, Mrs. Hineline changed Crystal's diaper, gave her only two ounces of formula, and again noted that she appeared disoriented and groggy. Mrs. Hine-

---

3. Crystal was also administered at that time a liquid polio vaccine by mouth.

4. Mrs. Hineline testified that Crystal's usual schedule would be to sleep for 15 minutes, wake up for 15 minutes, then sleep for another 15 minutes, etc.

5. Mrs. Hineline also noted that she was not overly concerned with Crystal's loss of appetite, sleepiness, or fussiness because she had been through a somewhat similar experience when her son was previously vaccinated.

line stated that oddly Crystal was not in her usual very playful mood when she awoke; consequently, at around 5:30 a.m., following her feeding, Crystal was put back to bed.

Mrs. Hineline went back to sleep and was awakened at 8:00 a.m. by the telephone. After talking on the phone, she checked on Crystal nudging her two times but there was no response. In fact, Crystal was not breathing. Mrs. Hineline picked her up and noticed purple and blue blotches on the side of her face. Each blotch was about the size of a quarter and was located on the side on which she was lying. Mrs. Hineline then called paramedics, who arrived within minutes, and commenced cardiopulmonary resuscitation. Shortly thereafter, Crystal and Mrs. Hineline were rushed by ambulance to the Pocono Medical Center, where Crystal was pronounced dead upon arrival at 9:20 a.m. on June 29, 1988.

Four hours subsequent to her death, Dr. Isidore Mihalakis, M.D. performed an autopsy.[6] Dr. Mihalakis concluded as follows:

After review of history and complete autopsy of the body of the youngster, Crystal R. Miller, death is attributed to the Sudden Infant Death Syndrome, the so-called crib death.

Multiple theories have been advanced to explain this entity, however, none has withstood the test of time. Annually, roughly 6,000 to 8,000 infants between the ages of one and about seven to eight months die of this clinical entity.

Prior theories include allergies, immune deficiencies, hyper-thyroidism, overlaying, sleep and rapid eye movement disorders and hemoglobinopathies. The current theory accepted by most individuals involves immaturity with sudden cessation of the respiratory center.

The manner of death is natural.

Significantly, the autopsy report was negative for findings on gross and microscopic examination and toxicology. In his testimony, Dr. Mihalakis further stated that:

The conclusions of both the visual, meaning the gross findings at the time of autopsy, and the microscopic findings were that this was a totally negative autopsy meaning that there were no [sic] either visual or microscopic findings to which I could attribute the death.

Therefore, by default, it gets into the category of the Sudden Infant Death Syndrome.

Dr. Mihalakis attributed the purple and blue blotches on Crystal's face to a process known as lividity:

Lividity is a settling of the blood after death to the lowermost portions of the body. It begins essentially at the time of death and may progress to become more prominent. And then after about six or eight hours or so if the body is shifted in its position, there will be only partial shifting of the lividity.

Merely it is a settling phenomenon within the blood vessels and we're able to see this discoloration through the skin. And this purplish discoloration is termed lividity.

The court observes that her lividity occurred not in the "lower most portions of the body," but rather in the upper most portion thereof. Dr. Mihalakis also stated that he had no independent way of knowing the exact time at which death occurred. However, given his conclusion as to the extent of lividity and rigor mortis, he did believe that Crystal must have been dead for one to two hours prior to discovery.

Dr. Mihalakis next ruled out any anaphylactic reaction:

... anaphylaxis comes under the pathologic findings. We would have to see some laryngeal edema, we would have to see some out-pouring of cells which characteristically occur as part of an allergic response, whether it be mast ... cells or eosinophiles and edema of the upper respiratory tract. We would also see a lot

---

6. The court recognized Dr. Mihalakis as an expert in the field of forensic pathology. Dr. Mihalakis is certified by the American Board of

Pathology and Anatomic Pathology in clinical pathology and forensic pathology.

of edema in the lungs. We didn't see any of that.[7]

It must be noted that at the time of the autopsy, Dr. Mihalakis did not have access to the hospital records and therefore was not aware of the DPT vaccination Crystal received the day before. However, Dr. Mihalakis testified that even if he had known that Crystal was administered the DPT prior to her death, such information would not have altered the ultimate conclusion of the autopsy. Specifically, he said that "[a] negative autopsy is a negative autopsy." The doctor did note, however, that the only thing he may have done differently had he known of the DPT vaccination is to order a diagnostic tryptase test, which would rule out the possibility of an anaphylactic response, but that such a test did not become available until the middle or latter part of 1990.

Dr. Mihalakis went on to testify that there was no HHE or shock collapse. Specifically, he noted that:

> If we're talking this thing [HHE] occurring over a period of time, at least part of my reading of the shock collapse syndrome includes multiple other things.

> But the child up until the time of death, we know by the mother's own admission was fussy, so therefore she was able to respond.

> There was no shock in the sense that there was no profusion of the kidneys because by the mother's own admission, she needed an increased number of diaper changes due to increased urination. There was no paralysis of any of the extremities and the baby was able to move.

> There was no difficulty in arousing the child.

There was some difficulty in sleeping, at least one gets the impression that normally it took like 15 minutes for the child to go back to sleep and it was kind of fussy.

> There was no loss of consciousness or depression of consciousness, which are part and parcel of a shock collapse type syndrome.

> Therefore, I could not call it as such preceding death.

However, Dr. Mihalakis did concede that a shock-like state occurs during the death process, noting that "before the person dies, when the vital functions stop, there is a shock effect. I mean, everybody goes through this, everybody who dies."

Dr. Mihalakis subsequently noted that Sudden Infant Death Syndrome (SIDS) is the result of cardiovascular or respiratory arrest and that there was clearly a cardiovascular or respiratory arrest in this case, which occurred at some point between 5:30 a.m. and 8:30 a.m. on June 29, 1988. Prior to the cardiovascular or respiratory arrest, Dr. Mihalakis also stated that other events occurred that led to arrest and furthered the death process, such as loss of consciousness, loss of color, turning blue and unresponsiveness to environmental stimuli. However, although Dr. Mihalakis conceded that everyone loses consciousness before death, he could *not* determine in this case how far in advance of Crystal's death she became unconscious.

Dr. Edward A. Mortimer, Jr., was the expert witness of the Department of Health and Human Services.[8] He reviewed Crystal's case and prepared a written report based on his review. When asked to describe what an observation of a child in shock collapse would appear like, he stated:

---

**7.** Edema is characterized by the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body. *Widdoss v. Department of Health and Human Servs.*, No. 90–486V, slip op. at 8 n. 29, 1991 WL 112208 (Cl.Ct.Spec.Mstr. June 7, 1991).

The court pointed out to Dr. Mihalakis an article offered by the petitioner that states "pulmonary edema has always been mentioned as being a characteristic of SIDS," even though the doctor testified there was no edema. Dr. Miha-

lakis responded by saying "[i]t was primarily collapsed and I saw congestion."

**8.** Dr. Mortimer was recognized by the court as an expert in the fields of pediatrics and epidemiology. He is a professor of epidemiology, pediatrics, and general medical sciences at Case Western Reserve University in Cleveland, Ohio. Dr. Mortimer has testified in previous vaccine cases before the special masters, and on behalf of petitioners in those cases.

The child would be pale, bluish, perhaps perspiring in sort of a cold sweat. What we call obtunded....

\* \* \* \* \* \*

... which means anything from semicoma on up. And would probably have very shallow breathing.

Based solely on Crystal's diminished appetite and three diaper changes including one bowel movement, Dr. Mortimer opined that Crystal did not suffer a hypotonic-hyporesponsive collapse. When Dr. Mortimer was given a summary of Mrs. Hineline's testimony concerning her recollection of the entire 24–hour period, which included accounts of Crystal's grogginess and unplayfulness, he did not change his opinion. Rather, he stated that these are "typical symptoms incurred by a great many children following a dose of DTP." Specifically, Dr. Mortimer noted in his written report that:

Careful review of the prenatal, obstetrical, neonatal, and pediatric records, as well as the autopsy report, provide no evidence that this unfortunate death bears any relationship to the vaccines that the infant received the previous day. Neither in the petition nor in the clinical records is the slightest suggestion that the child had anaphylactic shock, shock-collapse, or encephalopathy. If anaphylaxis had occurred, its manifestation should have appeared within minutes of receipt of these vaccines. Similarly, shock-collapse following DPT, as reported in the medical literature, has always begun within ten hours of administration of DPT.[9] Additionally, there is no comment about the infant being abnormal at 5:30 a.m. when the mother changed her diaper. Finally, nowhere in the records is there a description of any symptoms even remotely suggestive of anaphylaxis. The only conclusion that can be drawn is

that this infant's death had nothing to do with the administration of any vaccine.

Dr. Mortimer does agree with Dr. Mihalakis that the cause of Crystal's death was SIDS.[10] However, Dr. Mortimer also admitted that at some period between 5:30 a.m. and the time she was discovered around 8:30 a.m., Crystal suffered cardiovascular or respiratory arrest. He also believed that at the time of her death Crystal would have lost consciousness, lost color or become pale and would have been unresponsive to stimuli. When specifically questioned by Special Master Wright as to the association between shock collapse and the death process, Dr. Mortimer stated that:

[Shock collapse] is part and parcel of the death process. The heart stops. When the heart doesn't pump, there's no blood pressure. So you have shock and you have collapse—no blood supply goes to the brain or the rest of the body and one has collapse.

Shock collapse is secondary to circulatory problems. And, in the death process, it's secondary to the heart stopping.

Furthermore, Dr. Mortimer testified that Crystal would have had to undergo a shock collapse associated with death because "[t]hat's part of death." In addition, he noted that in the case at issue, the "death [was] linked temporally to DPT" although he did not know of any deaths linked causatively to DPT. However, he also stated that "shock collapse is a consequence of the SIDS and whatever causes the SIDS." Dr. Philip J.G. Quigley testified as an expert on behalf of the petitioner.[11] Based upon his review of "the medical records, the emergency room record, the coroner's office report[,] ... the autopsy report," and the slides, Dr. Quigley opined that:

... it is my professional opinion that, with reasonable medical certainty, her death fulfills the conditions set forth in

---

9. Dr. Mortimer concedes in his testimony that the word "always" could conceivably not mean that.

10. Dr. Mortimer agrees that there is no way that medicine can give a specific reason as to what causes SIDS.

11. Dr. Quigley was qualified by the court as an expert in pathology. He is a board certified pathologist who "practiced for two years as a chief medical examiner of Delaware and almost twenty years as a general pathologist in hospital practice." He also has a law degree from Seton Hall University.

42 U.S.C. § 300aa–14(a)IA or C as qualified in 42 U.S.C.A. 300aa–14(b), as being related to the administration of DPT vaccine.[12]

In his testimony, Dr. Quigley restated his belief that based on the aforementioned criteria, as well as the testimony of Dr. Mihalakis and Mrs. Hineline, there was evidence of shock collapse or HHE. Specifically, he said:

> The child was responsive at I believe five or five-thirty, whatever that time was. And was found around eight a.m., assuming that was the time, in all probability, already dead.
>
> And it follows that there had to be a cardiac and respiratory arrest occurring between those two times. And that such a death event with a reasonable degree of medical certainty was preceded by a shock and collapse, or as it's described, a hypotonic-hyporesponsive collapse situation, for some time prior to that arrest or coincident with it.

Dr. Quigley agreed with Dr. Mihalakis that there was no pulmonary edema. However, Dr. Quigley also agreed with Dr. Mihalakis that "SIDS is a diagnosis by exclusion ..." and agreed with Dr. Mihalakis's conclusions with regard to SIDS in this case. In addition, Dr. Quigley noted that he did not believe that he could come to any direct conclusion that the DPT vaccine was the cause of Crystal's death. Specifically, he stated that "[s]ome vaccine deaths do cause traumatic anaphylaxes and so forth [but] [t]hat wasn't the case here." Dr. Quigley also noted that:

> ... if I had a case of sudden death with no findings and there was a vaccination

in fact nineteen hours before, I would have to give it some consideration.

\*    \*    \*    \*    \*    \*

> ... I just could not ignore that temporal association.

The testimony of Mrs. Hineline and Dr. Quigley for the petitioner, and Dr. Mihalakis and Dr. Mortimer for the respondent was taken at an evidentiary hearing on January 25, 1991, in Philadelphia, Pennsylvania.[13] Special Master Wright filed her decision on June 7, 1991, holding that petitioner Dawn R. Hineline failed to establish by a preponderance of the evidence that a Table injury known as HHE occurred within 72 hours of DPT administration which ultimately led to Crystal's death.

Specifically, Special Master Wright stated:

> The issue to be decided here is one of first impression. While in many cases, petitioners have attempted (sometimes successfully) to refute an autopsy diagnosis of SIDS, here petitioner put on no such evidence, and in fact conceded the autopsy's diagnosis of SIDS was correct. The question before the undersigned is whether a shock collapse that is "part and parcel of the death process" is compensable under the Act. None of the experts in this case disputes that everyone who dies suffers loss of muscle tone, pallor, unresponsiveness, depression and loss of consciousness and, ultimately, cardiovascular and respiratory arrest. This would be true in a SIDS death as well as death from any other cause.

\*    \*    \*    \*    \*    \*

---

**12.** 42 U.S.C.A. § 300aa–14(a) is the Vaccine Injury Table. 14(a)IA lists "anaphylaxis or anaphylactic shock." 14(a)IC lists "shock-collapse or hypotonic-hyporesponsive collapse." 14(b)(1) provides qualifications and aids to interpretation of a shock-collapse or hypotonic-hyporesponsive collapse.

The respondent argued that these statements were legal conclusions which Dr. Quigley was not qualified or competent to give. Respondent therefore urged that his opinion "be given no weight since he purports to resolve the ultimate issue in this case." We observe in this connection, however, that Dr. Quigley has obtained a law degree from Seton Hall University, and he

has been a member of the American Bar Association from 1974 to the present.

**13.** The original petition in this matter was filed on June 4, 1990. A notice of appearance was filed on behalf of the respondent on June 12, 1990. On October 12, 1990, respondent filed a medical report which recommended the denial of compensation for the alleged vaccine related injury. Dr. Mortimer prepared a supplement to this report which was filed on October 9, 1990. *Widdoss v. Department of Health and Human Servs.,* No. 90–486V, slip op. at 2, 1991 WL 112208 (Cl.Ct.Sp.Mstr. June 7, 1991).

The Vaccine Act requires that in order to enjoy the presumption of causation, not only must a Table injury occur within 72 hours of the vaccination in question, but the death must be a *sequela* of the injury.

\* \* \* \* \* \*

To say that death is a sequela of a shock-like state that is an integral part of the dying process simply defies logic. If I were to hold otherwise, I would essentially hold that any death within 72 hours of the administration of a vaccine is compensable absent alternative etiology. If the creators of the Vaccine Act had intended such a result, it would seem they would have made such provision explicit.

Special Master's Report, pp. 9–11.

The petitioner failed to meet the July 8, 1991, deadline for filing her motion for review of the special master's decision. She actually filed her petition on July 9, 1991, consequently the Clerk of the Court returned the motion as untimely. Mrs. Hineline then submitted a motion for reconsideration of the Clerk's conclusion, which was received on July 19, 1991, but not filed until August 19, 1991. On November 21, 1991, and after considering all of the pleadings, this court granted petitioner's motion for reconsideration. On November 27, 1991, the petitioner filed her motion for review of the special master's decision. In said motion, the petitioner prayed for $250,-000 in compensation and reasonable attorney fees. One month later, on December 27, 1991, the respondent filed a memorandum in opposition to petitioner's motion for review. There have been no additional filings as of this date.

*Contentions*

1. Petitioner

The petitioner offers two contentions. First, she argues that sufficient evidence exists to prove by a preponderance of the evidence that a Table injury occurred within 72 hours of administration of the DPT vaccine. Thus, avers petitioner, presumptive causation applies. Specifically, Mrs. Hineline points to the physiological changes of Crystal subsequent to the inoculation which she herself observed, such as "eating loss, depression of consciousness, unresponsive[ness] to environmental stimuli and prolonged sleeping with difficulty arousing." Petitioner contends that these symptoms are "indicative of a shock-collapse or a hypotonic-hyporesponsive collapse before her death." Furthermore, petitioner contends that the testimony of all three experts show that Crystal "suffered some or all of the signs or symptoms of a shock-collapse ... either just prior to her death or at the time of her death." Moreover, the petitioner argues that the language of the special master's decision indicates that even her belief is that a shock-collapse injury did occur with the only issue remaining being the *timing* of the condition. Based on the totality of the aforementioned arguments, therefore, it is contended by the petitioner that an HHE did in fact occur within 72 hours of administration of the vaccine and that therefore petitioner should recover.

The second contention offered by the petitioner is that the special master utilized an improper test in addressing the question at issue. Specifically, the petitioner states that the special master used a standard which improperly required the petitioner to prove, "by a preponderance of the evidence, that Crystal's death was a sequelae [sic] of a Table injury." Consequently, it is argued by the petitioner that one must prove by a preponderance of the evidence *only* that a Table injury occurred and not that the injury or death itself was caused by the vaccine. Moreover, she contends that the theory behind the Vaccine Act "is to minimize the need for petitioners to prove causation of injury from vaccines since there is an overwhelming lack of hard scientific or clinical evidence which connects specific injuries to vaccines."

2. Respondent

Conversely, respondent contends that the petitioner failed to meet her burden of proof which requires a demonstration, by a preponderance of the evidence, that Crystal suffered a Table injury within 72 hours of the DPT vaccination. First, respondent av-

ers that a clear reading of the Vaccine Act shows that death alone within 72 hours of administration of the vaccine does not, *ipso facto*, entitle petitioner to the presumption of causation. Rather, respondent states that petitioner must first show that a Table injury occurred, which burden she failed to carry. Within this argument, respondent contends "that if Congress had intended to compensate every death occurring within a certain time period following vaccination, it could simply have listed 'death' as an independent result in the Table."

Secondly, respondent argues that cardiorespiratory arrest which is involved in the death process is insufficient to demonstrate either a Table injury or a sequela of a Table injury. Moreover, respondent states that cardio-respiratory arrest, which is recognized as the death process, and HHE can be identified as two totally separate events in that HHE is "an identifiable event *preceding* the child's death." Given these contentions, respondent argues that the decision issued by the special master was neither arbitrary, capricious, or otherwise not in accordance with law.

*Discussion*

1. Vaccine Act

Before addressing the applicable standard of review in these matters, we deem it appropriate to briefly and succinctly review the purpose of providing compensation under the Vaccine Act. In this connection, it is well established that said legislation created a no-fault system for providing compensation to individuals injured by pediatric vaccinations. H.R.Rep. No. 99–908, 99th Cong., 2nd Sess. 1, 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344. Specifically:

> [C]ongress intended [to create] a quick, flexible, and streamlined system. [The original legislation] *called for a compensation procedure that administered awards "quickly, easily and with certainty and generosity." The system was intended to be fair,* simple and easy to administer "and to compensate persons with recognized vaccine injuries without requiring the individual determinations of causation of injury."

(emphasis added). H.R.Conf.Rep. No. 101–386, 101st Cong., 1st Sess. 509, 512, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3112, 3115, *citing* H.R.Rep. No. 99–908, 99th Cong., 2nd Sess. 1, 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344. By creating a system which does not actually require the petitioner to offer proof of the manufacturer's negligence, "this program would have the potential to reverse the spiraling cost of childhood vaccines and the dwindling number of vaccine manufacturers caused by injured individuals seeking relief through the traditional tort system." *Stotts v. Department of Health and Human Servs.,* 23 Cl.Ct. 352, 358 (1991). It is anticipated that the speed and low transaction costs of the compensation program, in addition to the "no-fault nature of the required findings" will likely "divert a significant number of potential plaintiffs from litigation." H.R.Rep. No. 99–908, 99th Cong., 1st Sess. at 13, 1986 U.S.Code Cong. & Admin.News 6344, 6354.

In furtherance of these principles, Congress created the Office of the Special Masters as an adjunct of the United States Claims Court and summoned both entities to ensure that prompt and fair resolution of such claims was available to individuals suffering from vaccine-related injuries. *Stotts,* 23 Cl.Ct. at 358. The special master's function is, therefore, to determine by an impartial and efficient investigation— whether the individual who was administered the vaccine "suffered a compensable vaccine-related injury, and if so, the extent of compensable damages." *Id.*

Section 300aa–13(a) of the Vaccine Act sets forth, with respect to eligibility determinations, as a general rule that:

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disabili-

ty, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

(2) For purposes of paragraph (1), the term "factors unrelated to the administration of the vaccine"—

(A) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition, and

(B) may, as documented by the petitioner's evidence or other material in the record, include infection, toxins, trauma (including birth trauma and related anoxia), or metabolic disturbances, which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death.

Therefore, the elements which petitioner must prove by a preponderance of the evidence as listed in section 11(c)(1) are as follows:

(i)  petitioner received a vaccine listed in the Vaccine Injury Table; [14]

(ii)  the vaccine was administered in the United States; [15]

(iii)  petitioner sustained an injury listed on the Table or died from the administration of such vaccine within the time period noted in the Table; [16] and

(iv)  petitioner has not previously collected a judgment or settlement in a prior or pending civil action. [17]

In addition, where, as here, the injured person is a minor, the action must be brought by the victim's legal representative. [18]

Of the criteria outlined above, causation is the most critical element. More specifically, section 11(c)(1)(C) requires the petitioner to show, in that connection, that the injured individual:

(i) sustained ... any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) or died from the administration of such vaccine and the first symptom or manifestation of the onset ... of any such illness, disability, injury or condition or the death occurred within [72 hours] after vaccine administration set forth in the Vaccine Injury Table, or

(ii)(I) sustained ... any illness, disability, injury or condition not set forth in the Vaccine Injury Table but which was caused by the vaccine referred to in subparagraph (A), or

(II) sustained ... any illness, disability, injury or condition set forth in the Vaccine Injury Table the first symptom or manifestation of the onset ... which did not occur within the time period set forth in the Table but which was caused by the vaccine referred to in subparagraph (A).

Compensation will therefore be prescribed if the petitioner can establish by a preponderance of the evidence, in addition to the other criteria outlined above, that a Table injury occurred within 72 hours of administration of the vaccine under either presumed causation in section 11(c)(1)(C)(i), or causation-in-fact under section 11(c)(1)(C)(ii). Clearly, a Table injury by a preponderance of the evidence under (c)(1)(C)(i) is easier to prove because it is really nothing more than the doctrine of presumed causation. *Bunting v. Department of Health and Human Servs.*, 931 F.2d 867, 871–72 (Fed.Cir.1991). As a general proposition, therefore, three essential elements must be established by the petitioner by the requisite quantum of proof: first, it must be demonstrated that a listed vaccine was administered in the United

**14.**  Section 11(c)(1)(A).

**15.**  Section 11(c)(1)(B)(i)(I).

**16.**  Section 11(c)(1)(C)(i).

**17.**  Section 11(c)(1)(E).

**18.**  Section 11(b)(1)(A).

States; secondly, it must be established that one or more of the injuries listed on the Table occurred;[19] and thirdly, petitioner must prove that the first symptom of the injury appeared or was manifested within 72 hours of the administration of the vaccine. In the context of the case at bar, it is indisputable—that the administered DPT is a vaccine listed in the Table; that it was administered in the United States; and that the Table time frame for the shock-collapse or hypotonic-hyporesponsive collapse, the injury alleged to have occurred by the petitioner, surfaced and manifested itself within three days or 72 hours of the administration of the vaccine. Therefore, in addressing the dispositive issue in this case, this court will first determine whether the less strict elements of the presumed causation theory have been established by the requisite quantum of proof.

The causation-in-fact theory, as codified in § 300aa–11(c)(1)(A) and (c)(1)(C)(ii), applies to injuries not listed on the Table, or to injuries listed on the Table that do not manifest within the statutory time frame. Under this more onerous standard, compensation will therefore be allowed only if a listed vaccine was administered and petitioners can demonstrate that the vaccine *actually* caused the injury.

■ It is, of course, axiomatic that, in analyzing a claim under the Vaccine Act, the petitioner must initially prove each required element by a preponderance of the evidence, and "not scientific certainty." *Bunting*, 931 F.2d at 873; § 300aa–13(a)(1)(A). The preponderance burden of proof requires only that the petitioner offer probative evidence that makes the existence of a contested fact more likely than not. E. Cleary, *McCormick's Handbook on the Law of Evidence*, § 339 (1989). Simply stated, all that is required pursuant to the preponderance of the evidence stan-

dard is that it be shown that it is *more probable than not* that the individual—received a listed vaccine, and incurred an injury listed on the Table within the statutory time frame. Thus, it is evident that the preponderance standard is "a very hospitable standard, and the evidence adduced by the petitioners should, of course, be weighed accordingly." *McClendon v. Department of Health and Human Servs.*, 23 Cl.Ct. 191, 195–96 (1991). This approach is, of course, thoroughly consistent with Congress's intent that "awards [be administered] quickly, easily and with certain generosity."

■ If a threshold *prima facie* case is made by the petitioner duly demonstrating presumed (or actual) causation, the special master *must* then address alternative causation evidence proffered under § 300aa–13(a)(1)(B). This means that once the petitioner has made his case, the burden of going forward with the evidence shifts to the respondent. The respondent must then show, by a preponderance of the evidence, in order to avoid paying compensation, that the injury incurred was the result of a factor or factors unrelated to the vaccine. In addressing this burden, the respondent may not proffer and utilize an alternative causation argument which is based on an injury which is "unexplainable, unknown, hypothetical, or undocumentable" such as SIDS. § 300aa–13(a)(2)(A).[20] It should be noted that a "determination by the special master relative to alternative causation must also be based on more than mere supposition or guesswork." *McClendon*, 23 Cl.Ct. at 196, *citing* § 300aa–13(a)(2).[21] These detailed requirements of the special master are "indispensable prerequisites to effective and timely review of the Claims Court." *Id.*

Finally, with respect to the application of the standard doctrine of presumed causa-

---

**19.** The Vaccine Injury Table is set forth in section 300aa–14 of the Act.

**20.** A SIDS diagnosis as the cause of death does not qualify as an alternative cause because "SIDS is an idiopathic or unexplained cause." *Morris v. Department of Health and Human Servs.*, 20 Cl.Ct. 14, 22 n. 7 (1990).

**21.** In addition, in addressing both the petitioner's and respondent's burdens, each determination must be substantiated by reference to medical records or medical opinion, and may not be premised solely on the observations and testimony of the parents of the child. § 300aa–13(a)(1).

tion, it should be noted that Congress expected that some errors would occur when making determinations for compensation under the Vaccine Act, and consequently recognized "that any error should be committed in connection with *granting* and not denying compensation":

> The Committee recognizes that there is a public debate over the incidence of illness that coincidentally occurs within a short time of vaccination. *The Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine related.* The Committee anticipates that the research on vaccine injury and vaccine safety mandated by this legislation will soon provide more definitive information about the incidence of vaccine injury and that, when such information is available, [the Table may be revised].... *Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors.*

(emphasis added). *McClendon v. Department of Health and Human Servs.*, 24 Cl.Ct. 329, 334–35 (1990), *citing* H.R.Rep. No. 99–908, 99th Cong., 2nd Sess. 1, 18, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6359. We believe that the foregoing admonishment by Congress is the key to the dispositive issue at bar.

2. Standard of Review

■ The petitioner, Mrs. Hineline, filed in this court a motion to review the decision of the special master denying her compensation under the Vaccine Act. Therein, the special master held that according to the aforementioned statutory scheme, the petitioner failed to demonstrate by a preponderance of the evidence that a Table injury occurred within 72 hours of administration of the DPT vaccine. With respect to procedures applicable to the review of decisions by the special master, § 300aa–12(e)(2) of the Act provides, in pertinent part, that:

> (2) Upon filing of a motion [for review of a special master's decision] with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—
>
> (a) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (b) set aside any findings of fact or conclusions of law of the special master found to be *arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law,* or
>
> (c) remand the petition to the special master for further action in accordance with the court's direction.

(emphasis added). Accordingly, it is evident from the foregoing that the Claims Court, when reviewing the decision of the special master under the Vaccine Act, may, *inter alia*, set aside findings of fact and conclusions of law which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Brown v. Department of Health and Human Servs.*, 920 F.2d 918, 919 (Fed.Cir.1990). Under this standard of review, the court, of course, "may not substitute its judgment for that of the special master." *Mobley v. Department of Health and Human Servs.*, 22 Cl.Ct. 423, 426 (1991), *citing Hines v. Department of Health and Human Servs.*, 21 Cl.Ct. 634 (1990). In fact, the Claims Court may overturn the findings of fact and conclusions of law of the special master only where "review of the record reveals that no rational basis exists for the decision." *Id., citing Hyundai Electr. Indus. v. United States Int'l Trade Comm.*, 899 F.2d 1204, 1209 (Fed.Cir.1990). A determination of "arbitrary and capricious" conduct may also include decisions where the special master has erroneously relied on factors which Congress has not intended to be considered, "or has offered an explanation of the decision that runs counter to the evidence, or is so implausible that it could not be ascribed to a difference in view or a product of expertise." *Hale v.*

*Department of Health and Human Servs.*, 22 Cl.Ct. 403, 406 (1991), *citing Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). However, if conflicting evidence does in fact truly exist, appropriate deference should, of course, be given to the special master's findings. *Id., citing Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986).

### 3. Need for Reversal

▮ The legal conclusion by the special master, which denied compensation based primarily, if not solely, on the premise that shock-collapse and cardiovascular arrest are merely integral parts of the death process and, therefore, are not a Table injury which Congress intended to compensate under the Vaccine Act, is faulty statutory construction, and therefore legal error. Given this conclusion, the special master averred that the dispositive question before her was—whether a shock collapse that is part and parcel to the death process is compensable under the Vaccine Act. Because we find the special master to be in error on an issue of law, this court must apply its *de novo* construction, reverse the special master, and hold that the petitioner is entitled to compensation on this record. § 300aa–12(e)(2)(B).

As a prelude to a discussion of the operative evidence, it is appropriate to recall that in order to make out a *prima facie* case of *presumed causation* where compensation shall be awarded, all that the petitioner must accomplish is to "demonstrate by a preponderance[22] of the evidence the matters required in the petition by section 300aa–11(c)(1)," and in particular § 300aa–11(c)(1)(C)(i). *See* § 300aa–13(a)(1)(A).[23] The special master acknowledged that the petitioner duly satisfied all such elements except one, and that is—"[t]here is not a preponderance of evidence that Crystal Renee Miller's death was a sequela of a Table injury."

As we see the dispositive issue, on this record as a whole, the question simply is—whether petitioner has proffered sufficient proof to establish that it is *more probable than not* that she has met the requirements of the presumed causation provision of § 300aa–11(c)(1)(C)(i). For purposes of this record, the operative provisions therein required to be proven by a preponderance of the evidence are as follows:

A petition for compensation ... for a vaccine-related ... death shall contain (1) ... [a] demonstrat[ion] that *the person ... who died*

(C)(i) *sustained ... any ... condition* set forth *in the Vaccine Injury Table* in association with the vaccine referred to in subparagraph (A) or *died from the administration of such vaccine, and the first symptom* or manifestation of the onset ... of any such ... condition *or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table.*

(emphasis added).

▮ In applying the critical provisions of the foregoing statutory provisions, this court is thoroughly mindful of the recent admonishment by the Court of Appeals for the Federal Circuit in *Bunting*, 931 F.2d at 867, wherein it emphasized that—the special master may not summarily discard the expert opinion testimony of a witness without a thorough and rational explanation, *id.* at 872–73; it is the petitioner's burden to prove a Table injury only by a simple preponderance of the evidence, not scientific certainty, *id.*, at 873; and it is not petitioner's burden to disprove every possible ground of causation suggested by respondent, nor must the findings of the court meet the standards of a laboratorian, *id.* at 873. Moreover, in *Johnston v. United States*, 22 Cl.Ct. 75, 76 (1990), the court there held that close questions of causation must be resolved in favor of the petitioner.

We begin our analysis by stating that the Vaccine Act's Qualifications and Aids to

---

**22.** The preponderance standard means that—the existence of a fact is more probable than its non-existence.

**23.** To prevail, of course, the court must find that there is not a preponderance of evidence that the condition or death is due to factors unrelated to the administration of the vaccine.

Interpretation provision states that "shock-collapse" may be evidenced by:

> ... indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete[) ], hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

§ 300aa–14(b)(1). The special master denied compensation based on the interpretation of this statutory language. Moreover, she held that the requirements of this language were not satisfied, because the petitioner *failed* to prove by a preponderance of the evidence that Crystal suffered an HHE Table injury within 72 hours of administration of the DPT.

At the outset, we observe and find that all three medical experts conceded that Crystal suffered one or more of the symptoms of a shock-collapse within three days of the inoculation. In that connection, the opinion testimony presented by Dr. Mihalakis and Dr. Mortimer, expert witnesses for the respondent, and Dr. Quigley, expert witness for the petitioner, established that a cardiovascular arrest did in fact occur in Crystal before she died. For example, Dr. Mihalakis did note that there clearly was a cardiovascular or respiratory arrest in Crystal's case. Dr. Mihalakis, who performed the autopsy, concluded, however, that SIDS was the cause of Crystal's death. In addition, Dr. Mihalakis concluded that other events occurred in Crystal that led to the cardiovascular arrest and furthered the death process, such as loss of consciousness, turning blue and lack of response to environmental stimuli. Moreover, the special master found that he admitted that "a shock-like state occurs during the death process ... [and] that a respiratory or cardiovascular arrest preceded Crystal's death.... [However,] there is no way to determine how far in advance of her death Crystal became unconscious.... Crystal would have been unresponsive to environ-

mental stimuli and would have lost color in the period prior to death."

Dr. Mortimer, the other expert witness for the respondent, also agreed with Dr. Mihalakis that *the* cause of Crystal's death was SIDS. Dr. Mortimer also testified that Crystal suffered cardiovascular or respiratory arrest sometime between 5:30 and 8:30 a.m. on June 29, 1988. In addition, he conceded that at the time of her death, Crystal would have lost consciousness, lost color and would have been unresponsive to environmental stimuli. Furthermore, Dr. Mortimer testified in response to the special master's question as follows:

> THE COURT: ... Would Crystal Widdoss have undergone then this pre-death shock-collapse?
>
>     \*      \*      \*      \*      \*      \*
>
> My question simply is did she, in your view, undergo a shock-collapse associated with her death?
>
> THE WITNESS: Well she has to have. That's part of death.

Dr. Quigley, the expert witness for the petitioner, also agreed with Dr. Mihalakis's conclusions with regard to SIDS. Nevertheless, when questioned on direct examination, he testified as follows:

> Q. Now.... do you have an opinion based upon a reasonable degree of medical certainty as to whether there was [sic] any evidence or indicia or signs of hypotonic or hyporesponsive collapse or shock collapse in regard to Crystal Renee Miller prior to her death?
>
> A. Yes, I do.
>
> Q. What is that opinion, doctor?
>
> A. My opinion is that there was.
>
> Q. And tell us why.
>
> A. ... The child was responsive at I believe five or five-thirty, ... And was found around eight a.m. ... And that such a death event with a reasonable degree of medical certainty was preceded by a shock and collapse, or as it's described, a hypotonic-hyporesponsive collapse situation, for some time prior to that arrest or coincident with it.[24]

---

**24.** In a written memorandum, Dr. Quigley also stated that Crystal's death fulfilled the HHE requirements as set out in the Vaccine Act as being related to the DPT. Pet.Exh. 14–2.

In a previous affidavit dated November 29, 1990, Dr. Quigley also stated the following:

After review of all the aforementioned reports, records and slides, it is my professional opinion, based upon a reasonable degree of medical certainty, that as a result of the administration of the DPT–Polio, combination vaccine given to Crystal R. Miller on June 28, 1988, said child developed shock-collapse as hypotonic-hyporesponsive collapse as evidenced by the symptoms of cardiovascular and/or respiratory arrest which then caused her death.

I base this opinion on these facts:

(a) The vaccine was administered within nineteen hours of the child's death.

(b) There is no other incident of trauma or illness preceeding [sic] the child's death other than normal childhood illnesses and the injection of the vaccine.

(c) According to the mother's statements ... at approximately 8:00 a.m. on the morning of June 29, 1990 [sic 1988], she found the child limp, cold, bluish/purplish in color, unresponsive and not breathing....

(d) According to the records of Pocono Hospital dated June 29, 1990 [sic 1988] the child remained unresponsive and in cardiovascular and/or respiratory arrest, and was ultimately pronounced dead ... at 9:00 a.m.

Despite the foregoing probative evidence of these three experts agreeing that Crystal suffered cardiovascular arrest, unresponsiveness, color change and loss of consciousness, and died within 20½ hours of the administration of her DPT vaccine, the special master held, nevertheless, that the petitioner failed to successfully refute an autopsy diagnosis of SIDS and prove that the HHE[25] occurred. The special master's rationale for rejecting compensation to petitioner was simply a question of timing. She noted that the "question before [her was] whether a shock collapse that is 'part and parcel of the death process' is compen-sable under the Act." Therefore, the special master based her decision on the timing of the cardiovascular and respiratory arrest, unresponsiveness to stimuli, color change and loss of consciousness that led to Crystal's death. Specifically, she stated that to "say that death is a sequela of a shock-like state that is an integral part of the dying process simply defies logic."

Her basis was one of overinclusiveness in that she was concerned that an award of compensation in this case would essentially result in a carte blanche invitation to compensation for any death occurring within 72 hours of administration of a vaccine. Moreover, she noted that "if the creators of the Vaccine Act had intended such a [hospitable] result, it would seem they would have made such provision explicit." It is this statutory interpretation with respect to which we find that the special master has erred.

A similar error by a special master was noted by Senior Judge Harkins in *Hellebrand v. Department of Health and Human Servs.*, 24 Cl.Ct. 756 (1991). In *Hellebrand*, the baby, Lacey Marie, was born on December 31, 1983, in an "uneventful pregnancy" and was treated for colic (with phenobarbital) and congestion during her second month. *Id.* at 758. On March 7, 1984, between 3:30 and 4:00 p.m., the baby was administered her first DPT vaccination. *Id.* At her 6 p.m. feeding she cried and did not finish her bottle; the crying was hard and continuous for about two hours; and around 7:00–7:30 p.m. she was given her usual dosage of phenobarbital after which she fell asleep. She awoke at about 9:30 p.m. and consumed a small portion of her normal meal. Around 10 p.m. she fell asleep again until about midnight when she awoke. While lying in her crib, she appeared drowsy or dazed. The next morning between 6:00 and 6:30 a.m., she was found dead in her crib. The cause of Lacey's death is unknown. It was listed in the medical examiner's report, however, that the cause of death was bronchopneu-

**25.** A § 300aa–14(b)(1) hypotonic-hyporesponsive episode (or collapse) is euphemistically known as an HHE.

monia. Two of respondent's medical experts, as at bar, identified SIDS as the cause of death.

Petitioners in *Hellebrand* averred that the evidence of a Table injury consists of— depressed consciousness and non-responsiveness to stimuli, symptoms that are included in the aids to interpretation for a shock collapse or hypotonic-hyporesponsive (HHE) collapse.

On the other hand, Judge Harkins noted that the special master concluded that the preponderance of the evidence did not demonstrate that Lacey suffered an on-Table injury after her DPT shot and prior to death. This he concluded because the record did not show symptoms of an anaphylactic shock, and that the dramatic signs characteristic of an HHE were not present. No findings of fact as to the actual cause of death were made. The court there observed that "the core of the special master's statutory analysis is the concept that, for an on-table H–H collapse, the statute requires a showing that the death occurred as an acute complication or sequela of the H–H collapse," whereas here Lacey's claim indicates a death classified as SIDS that occurred 15 hours following DPT inoculation. Thus, it was contended that *other than the death*, the factual scenario did not manifest an HHE. This circumstance, we believe, mirrors Crystal's case in all material particulars.

Judge Harkins noted that the special master's holding, which stated that the petitioner did not demonstrate an HHE by a preponderance of the evidence, was based on an analysis which eliminated cardiovascular and respiratory arrest from the list of criteria outlined in § 300aa–14(b)(1) ("aids to interpretation"). *Id.* at 760. Judge Harkins pointed to a similar analytical approach utilized in *Allen v. Department of Health and Human Servs.*, slip op. at 3–4, 1991 WL 20054 (Cl.Ct.Spec.Mstr. Jan. 31, 1991), to show how the special master in *Hellebrand* erroneously weighed the evidence. *Id.* Specifically, the special master in *Allen* stated:

As to the cardiac and respiratory arrest, I give no weight to them. I agree with

respondent that it would be a tautology to base compensability for deaths on items which occur in essentially all deaths. Congress allowed compensation in death cases when death followed certain specific symptoms. To hold that factors (cardiac or respiratory arrest) indicative of one of those statutory symptoms (hypotonic-hyporesponsive collapse) is present in its statutory meaning whenever death occurs would render meaningless the rest of the statutory structure. Every death case within seventy-two hours of vaccination would then be compensable (absent some alternative cause). If Congress had intended such a result, it would have skipped the intermediate requirement of finding an on-table injury of which death was a sequela.

*Id.* at 760, *citing Allen.*

The opinion in *Hellebrand* forcefully criticizes this narrow analytical approach. Moreover, it held that the "special master's elimination of the cardiac and respiratory arrest items from the indicia and symptoms listed in the aids to interpretation does not accord with time honored canons of statutory construction." *Id.* at 761. It was unequivocally stated that the statutory "language itself" is the origin for interpretation and that if that language is clear "according to the ordinary meaning of the words, it is normally conclusive." *Id.*

Judge Harkins went on to further note that:

The items in Section 14(b)(1) are listed in the alternative such that any one of these indicia may be used, when in accord with the facts, to evidence a shock collapse or a [HHE]. Each of the items has utility for the purpose of determination of a Table injury. The cardiovascular or respiratory arrest item, for example, does not deprive the other items of utility when death occurs after the Table 72 hour period. Nor does the cardiovascular or respiratory arrest item make a death compensable in those cases where there is a known alternative cause for the death. The cardiovascular or respiratory arrest item only supersedes the other indicia when the cause of death is

unknown, *i.e.*, an idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, illness or condition. SIDS is such a condition.

It is clear that the statute does not intend that a SIDS autopsy should be a bar to recovery. The Vaccine Table provides for compensation of a SIDS death that is a sequela to an [HHE]. Eligibility for compensation for a death that occurs within 72 hours of the DTP [sic] vaccination because of an [HHE] is within the express terms of the statute. It is not for the court to delete this indicia on the ground that it may lead to a medically absurd result, or, may authorize compensation for all SIDS deaths that occur within 72 hours after vaccination with DTP [sic].

*Id.*

Finally, the *Hellebrand* court concluded that:

... The special master's elimination of the cardiovascular or respiratory arrest item from the determination of an on-Table injury presents an issue of statutory construction which is an issue of law. The special master is in error on this issue of law. In terms of the [Vaccine Act] objectives and in legal principles applicable to statutory construction, the error is unmistakably clear. The special master's decision, therefore, as to an on-Table injury must be rejected.

*Id.* at 763.

It is patently clear, therefore, that the operative facts in *Hellebrand* are similar in all material respects to those in the case at issue. Special Master Wright failed to give the necessary weight to the probative evidence of cardiovascular arrest, loss of responsiveness to environmental stimuli, color change and loss of consciousness because she associated it solely with part of

the normal death process for every individual who dies. This is unequivocally legal error.[26] The statute does not distinguish compensable shock-collapse on the basis of relative timing. There is no statutory language that gives greater weight to evidence of shock-collapse occurring closer in time to the administration of the vaccine and further from actual death. It is simply a bald assertion by the special master to contend that Congress would have drafted the statute to provide compensation for shock-collapse which is part of the death process had it so intended. The opposite conclusion must be drawn inasmuch as the statute unmistakably contemplates that cardiovascular or respiratory arrest, loss of responsiveness to environmental stimuli, color change and loss of consciousness are indicia of compensable shock-collapse.[27] Therefore, we are constrained to conclude on this record as a whole that a preponderance of the evidence clearly exists that an HHE occurred within 72 hours of DPT administration. All three experts articulated these indicia as stated in the "Aids to Interpretation." Since the criteria satisfy the literal meaning of the statute, the special master has erred by her failure to weigh the criteria as required.

The special master also gave considerable weight to the fact that petitioner did not refute the diagnosis of SIDS, especially considering that petitioner's expert, Dr. Quigley, agreed with the SIDS diagnosis. This is also a mistaken legal conclusion. The statute contains no language describing that a SIDS diagnosis would bar compensation. By contrast, the statute provides eligibility for compensation of a death that is a sequela to a shock-collapse. Death by SIDS clearly satisfies the meaning of "death" within the statute. This court may not ignore certain *prima facie*

---

**26.** In view of the following statement by the special master, it is apparent that she had substantial misgivings as to the accuracy of her legal conclusions:

There is certainly some appeal to the argument that where all experts concede that a shock-like state occurred concurrently with Crystal's death, that to require some nexus between the inoculation and the injury would

impermissibly abrogate petitioner's statutory presumption of causation where, as here, the injury occurred within 72 hours of the inoculation. This is particularly true where no alternative etiology exists to rebut the presumption. [footnote omitted]
Special Master's Report at 10.

**27.** Section 14(b)(1).

indicia just because, as the special master argues, it may lead to compensation for all SIDS deaths occurring within 72 hours of DPT administration.

In addition, the special master gave little weight to Dr. Quigley's statement that with reasonable medical certainty he believed there was an HHE within the meaning of the statute, even though he also agreed with the autopsy conclusion of SIDS, and moreover stated that he could not ascertain that DPT was the cause of death. These two positions, however, do not dilute his conclusion that an HHE occurred because once an HHE is shown, then there exists a rebuttable presumption that the vaccine caused the death. Causation-in-fact need not be proven if the 72-hour time limit is met, as is the case here. Therefore, the special master also erroneously deleted Dr. Quigley's conclusion of an HHE.

Finally, as noted previously, Congress did expect that some errors would occur when making determinations of compensation and clearly recognized that it was advisable to err on the side of *granting compensation,* rather than the contrary, especially when injuries cannot be demonstrated to be caused by other factors. A SIDS diagnosis is the perfect example. Since a SIDS diagnosis is a diagnosis by exclusion, it suggests that no other factors have been ascertained to demonstrate how death occurred. Therefore, the special master's concern with regard to compensating all SIDS deaths within 72 hours of DPT administration is unfounded, since it was clearly the legislative intent to provide compensation even when medical and scientific evidence was lacking.

*Conclusion*

Based on the foregoing, we find that the special master's decision, in failing to find a compensable Table injury, is erroneous and therefore must be set aside in that it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. § 300aa–12(e)(2)(B). Compensation must, therefore, be awarded to Mrs. Hineline. The Clerk is directed to enter judgment for an award under the Program to the petitioner in the amount of $250,000.00. Costs and attorney fees pursuant to § 300aa–15(b)(3) and 15(e) shall be determined by the special master in subsequent proceedings within 30 days from the date of this opinion.

IT IS SO ORDERED.